**FEN HIN CHON ENTERPRISES, LTD.**

v.

**PORELON, INC.**

No. 2–85–0118.

United States District Court, M.D. Tennessee, Northeastern Division.

Aug. 31, 1987.

---

11. No proof was introduced regarding entitlement to a POST salary supplement in 1986.

Jon Jones, Moore, Jones & Rader, Cookeville, Tenn., for plaintiff.

Eugene Jared, Madewell & Jared, Cookeville, Tenn., for defendant.

## MEMORANDUM

MORTON, Senior District Judge.

This is a breach of contract case. The court has jurisdiction pursuant to 28 U.S.C. § 1332. This case was tried without a jury, commencing on April 20, 1987, and concluding on May 4, 1987. For the reasons which follow, judgment shall be entered in favor of the plaintiff in the amount of $575,281.10.

## I. FINDINGS OF FACT

### A. *Background Information.*

The plaintiff, Fen Hin Chon Enterprises, Ltd. (hereinafter FHC), is a Hong Kong company with its principal place of business in Hong Kong. H.C. Tse and his sons, Wilson Tse and Edison Tse, were the principal agents of FHC. K.W. Hau, also an owner, was the manufacturing manager. A number of other members of the Tse and Hau families owned small percentages of FHC. The defendant, Porelon, Inc. (hereinafter Porelon), is a Delaware corporation with its principal place of business in Cookeville, Tennessee. Porelon is a subsidiary of Johnson Worldwide Affiliates. Dan Drab is the president of Porelon. Wil Ooms is employed by Johnson Wax Europlant and assigned to Porelon as a marketing agent. Ooms, a citizen of the Netherlands and a nonresident alien in the United States, was an employee and agent of Porelon in charge of Porelon's worldwide marketing at all times relevant to this litigation. Mark Universal, Ltd. (hereinafter MU), is a Hong Kong corporation, whose agents include Jackie Lam and Johnnie Lee. MU and Ooms have been dismissed as party defendants.

Porelon manufactures a premix [1] from which pre-inked handstamps are made. Po-

---

1. "Premix" is the manufacturing term for ink-impregnated plastic resins. Porelon generally sells the premix in 5-gallon pails.

relon sells the premix to various licensees throughout the world. The licensees bake the premix into a mold at a specific temperature and affix the stamp to a previously manufactured mount. Johnson Wax, which developed the pre-inked stamp process, originally held patents on the premix and the production technology. Patent licenses and, later, trade mark licenses for the names "Perma-Stamp" and "Porelon" were granted to various licensees by Porelon. Licensees were also given the right to use Porelon's "Know-how" and the right to purchase and use the premix from which handstamps are made. Porelon's primary competitor in the sale of premix is Polypore, Inc.

## B. *The Contracts.*

On November 15, 1974, Porelon and FHC entered into a license agreement which originally ran until December 31, 1979, but was later extended to December 31, 1984. The agreement provided, *inter alia*, that FHC could use Porelon's technology and trademarks (Porelon and Perma-Stamp) in the manufacture and sale of licensed products.[2] FHC was granted a nonexclusive license to use Porelon's Know-how in the manufacture of licensed products, and an exclusive license to use the Porelon and Perma-Stamp trademarks in the authorized territory of Hong Kong. FHC agreed to pay Porelon a royalty of 5 percent of net sales, with minimum annual royalties of $1,000 in 1975, $2,000 in 1976, and $4,000 for every year thereafter.

FHC successfully developed a market for the Perma-Stamp hand stamps in the Hong Kong territory; and on March 29, 1977, this agreement was amended by adding Indonesia[3] and Macao to the authorized territory and by adding the following new section:

2.3: LICENSOR grants LICENSEE an irrevocable, exclusive, non-assignable license under the Subject Patents to *make and sell Licensed Products in the Authorized Territory*, without the right to grant sublicenses. (Emphasis added.)

On September 1, 1980, at FHC's request, a second amendment was signed to provide for termination of the license only in the event of default or breach of the contract, rather than termination at will upon 60 days' notice as the original agreement provided.

On January 1, 1983, the parties entered into a *new* licensing agreement, superseding all previous agreements. The 1983 contract granted FHC an exclusive license to use Porelon's Know-how in the manufacture of licensed products and the subject trademarks in the designated territories of Hong Kong and Macao. FHC agreed to pay a royalty of 5 percent of net sales, with a minimum annual royalty of $20,000. The expiration date of the agreement was December 31, 1989.

## C. *Wil Ooms, Porelon's Worldwide Marketing Agent.*

In order to understand the methods through which Porelon breached its contract with FHC, it is essential to be aware of the full degree of Ooms' intermeddling with FHC's operations and to grasp the extent of the conspiratorial acts he wrongfully committed in an effort to deprive FHC of its exclusivity in Hong Kong. Therefore, the court chooses at the outset to express some observations regarding Ooms' integrity and credibility. Without a doubt, Ooms is a shrewd and cunning marketing executive with an uncompromising

**2.** Licensed products are defined in the Agreement as:

hand marking devices containing ink within or fed through a microporous structure, one or more components of which are manufactured or assembled *employing Know-How*, and:

(a) Which are manually impressible in one direction to produce a legend; and

(b) Which function without the aid of mechanical means such as gears, pulleys, belts, chains, levers, wheels, axles, inclined plans or spirals.
(Emphasis added.)

**3.** FHC still holds the Indonesian license pursuant to a new separate agreement dated January 1, 1985. The Indonesian license is not at issue in this litigation.

loyalty to Porelon. While such traits are commendable and important in terms of corporate profit, it is essential they be complemented by a measure of good faith and honest dealing when two companies are linked by valid contractual obligations. Ooms, an unyielding crusader for nonexclusive licenses, agreed that he was vehemently opposed to FHC's exclusivity in Hong Kong and that he desperately wanted to establish Mark Universal, Ltd., as FHC's competitor. The proof is abundant that he worked diligently to reach that goal. However, Ooms' cut-throat tactics in support of Porelon's "best interests" resulted in breaches of their license agreement with FHC and a significant amount of damages for which Porelon is now liable. It is clear beyond peradventure that Ooms placed the profitability of Porelon first in his business dealings, regardless of ethical considerations or the long-term effects of his behavior. Indeed, he possesses an amoral set of business ethics, agreeing that if anything "helps Porelon and makes Porelon money, in [his] opinion it's ethical." When Lam of Mark Universal attempted to bribe FHC's manufacturing manager, Ooms viewed the corruption as humorous. At trial, with a straight face, he termed the bribe an "incentive program." The record is replete with instances where Ooms misled, embarrassed, and lied to the officers of FHC. He attempted to sabotage their operations at every turn.

As though Ooms' iniquitous conduct toward FHC was not bad enough, Ooms was one of the most evasive [4] and least credible witnesses this court has observed in 17 years of judicial service. His courtroom testimony was repeatedly impeached, not only by his deposition, but often within the span of a few seconds by his own correspondence. While often he tempered the fabrications by interjecting his own peculiar interpretations (thereby arguably

stopping short of perjury), a plethora of untruthful statements compels the court to label much of Ooms' testimony as unworthy of credence. A search for the truth from a witness such as Ooms is a frustrating and futile task.

### D. *The First Breach—the Interruption of Business.*

On August 8, 1982, Jackie Lam of MU [5] sent a taped communication to Wil Ooms urging Ooms to breach Porelon's exclusive agreement with FHC and give MU a Hong Kong Perma-Stamp distributorship. MU was upset with FHC because FHC used distributors in addition to MU for the sales and distribution of their handstamps. It is clear from the record as a whole that there is no love lost between the Tse family of FHC and Lam and Lee of MU. The tape also extolled MU's prospects for acquiring the market for handstamps in China.[6] Aware of the virtually untapped Chinese market for pre-inked stamps, Ooms took the bait and began his crusade to eliminate FHC. In October 1982, Ooms visited Hong Kong. Although Ooms scheduled a three-party conference with FHC and MU, he failed to appear at the meeting with FHC and instead met only with MU at a dinner meeting where over 50 people representing MU assembled to talk with Ooms. Naturally, Ooms' attendance at MU's sales meeting undermined FHC's effectiveness and was a source of great embarrassment. Ooms claims that his only role in working with FHC and MU was that of mediator. Such an assertion is inherently inconsistent with his numerous private rendezvous with MU and the correspondence to MU in which he repeatedly requested "strategy meetings." Ooms had been informed by Wilson Tse that FHC desired to terminate MU as a distributor primarily because MU was dishonest and unethical.[7] FHC

---

**4.** Ooms even hesitated on the question of whether MU is *now* Porelon's licensee in Hong Kong—a fact which was stipulated.

**5.** At that time, MU was part of the sales force and was a distributor for FHC.

**6.** The market potential for pre-inked stamps in China was vast since a signature stamp is essen-

tial to conduct business affairs under the Chinese government. The stamp is necessary for food rations, banking, travel, etc.

**7.** Lam of MU had unsuccessfully attempted to bribe FHC's plant manager, K.W. Hau, by offering to pay him 40¢ per stamp for earlier delivery to MU than to the other distributors.

planned to secure MU's customer lists so that upon termination of MU on January 5, 1983, FHC's remaining distributors could obtain the sales previously held by MU, a plan which likely would have succeeded absent Ooms' interference. Since FHC held the exclusive license for the manufacture and distribution of Perma-Stamps in Hong Kong, they could have captured those sales had MU not been prepared to continue sales with imported stamps provided by Ooms, as addressed hereinafter.

Upon learning of FHC's intention to terminate MU, Ooms began actively assisting MU in a variety of ways. In November 1982, he furnished MU with a parcel of catalogs and zinc plate, materials used in the manufacture of handstamps. He hampered FHC's efforts to divert sales from MU by arranging for the preparation of sample stamps locally for MU when FHC restricted deliveries of samples. As a direct result of Ooms' support, when FHC terminated MU in January 1983, a substantial amount of sales were lost to MU. The most significant reinforcement provided by Ooms was his arrangement for the supply of Perma-Stamps to MU from Pacific Link, Porelon's licensee in Singapore, in January 1983. On December 28, 1982, Ooms promised MU a 200 stamps/day supply from Singapore to fill their orders since FHC had cut off MU's supply. This act was in direct violation of the licensing agreement with FHC. Only seven days earlier, in a letter which exhibits the height of hypocrisy, Ooms assured Wilson Tse that Porelon had no obligations to MU, that he hoped MU would be unsuccessful in selling a competitive product, and that he had declined to answer MU's questions about their possible termination by FHC. Obviously, Ooms *was* deeply involved in sustaining MU's lifeline at that point by supplying MU with stamps from Singapore and by assisting them in a factory set-up; and he deliberately misled FHC regarding his involvement with MU. In a postscript to the December 28, 1982 letter, Ooms has the audacity to commend a book for Tse's reading, *This We Believe*, the contents of which Ooms calls "identical to my personal standards and values of life."

On January 3, 1983, Ooms requested that Porelon's Singapore licensee, Pacific Link, provide as much support as possible to MU. A portion of his letter to Pacific Link bears repeating:

> Remember you are not allowed to sell directly into Hong Kong. If a Singapore company who buys from you sells into Hong Kong, it is beyond your and our control. MU and FHC no longer have a business relation, which I regret. We need to look for ethical ways to solve the situation.

Any reader with a single iota of sophistication can glean from this communication that Ooms *is* sustaining MU to FHC's detriment and that he knows to do so is unethical.

The principals of MU were only temporarily appeased by the Singapore supply of 200 stamps/day. Within two weeks they were filling the Hong Kong newspapers with propaganda by falsely advertising that they were Perma-Stamp's sole agent for the entire area of Southeast Asia. The advertisement announced that MU would sell a new type of Perma-Stamp which was technologically advanced. Naturally, MU's false advertising had a profound effect upon the Hong Kong market. Since FHC had promoted the Perma-Stamp trademark for years as the premiere pre-inked stamp, an advertisement hailing MU as the sole agent was devastating to FHC's sales, as more fully addressed *infra*. Although FHC immediately brought the fraudulent advertising to Porelon's attention in January 1983 [8] and repeatedly requested a disavowal of the ad, Porelon took no corrective action until November 1983, when they finally ran an advertisement identifying FHC as their agent in Hong Kong.

At this point in time, MU was operating not only as a handstamp distributor, but as a manufacturer as well. Although a hand-

---

**8.** On January 28, 1983, Ooms lied in a telex to Drab, informing him that corrections had been published. However, Drab was personally notified by FHC in April 1983 that no retraction had yet been published.

stamp manufacturing facility would normally require a set-up period of at least many months, MU was able to "hit the ground running," largely due to Ooms' advice and support. On January 28, 1983, Ooms telexed Drab advising that he had reached a basic agreement with MU which committed Porelon to sell premix to MU for the manufacture of handstamps in Hong Kong under the "pail price concept." [9] Ooms anticipated that MU could produce handstamps deleting the Perma-Stamp trademark and thereby circumvent Porelon's licensing agreement with FHC.[10] On January 31, 1983, Drab approved the pail pricing concept for sales of premix to MU for the production of handstamps. However, when Ooms met with MU on February 2, 1983, a disagreement resulted which brought a halt to the proposed agreement. When the plans to license MU as a manufacturer fell through, Ooms stopped the supply from the Singapore licensee. In his usual style, he suggested to Pacific Link that they deceive MU as to the reason for the halt in supply. Although Porelon did not consummate the deal with MU to manufacture licensed products, as a result of Ooms' assistance MU was operating as FHC's competition in both the manufacture and distribution of handstamps by March 1983.

Although the licensing agreement with FHC would not have expired until December 31, 1984, in April of 1983 Drab and Ooms met with FHC and negotiated a renewal of the contract which was backdated to January 1, 1983, with a new termination date of December 31, 1987. During this meeting in Hong Kong, FHC presented Porelon with an annotated outline of their plans for expansion, growth, sales and distribution. The outline specifically notified Porelon of MU's activities, including their manufacture of handstamps under the brand name STAMP. FHC naively reported to Porelon that the Perma-Stamp made by the Singapore licensee was "pouring into the market," and they again pleaded in vain for a correction of MU's false advertising. Porelon continued to conceal from FHC its previous involvement with MU.

E. *The Second Breach—The Termination.*

The opportunity to expand into the Chinese handstamp market was again brought home to Porelon in January 1985. On January 14, 1985, Lam and Lee of MU visited Porelon with a proposal to distribute Perma-Stamps in China. MU advised Porelon that the Ministry of Light Industries of the People's Republic of China [11] had granted MU the exclusive right to import and develop pre-inked handstamp technology into China. Later in January, Drab and Ooms traveled to Beijing to meet with the Ministry of Light Industries and MU. Jim Chen, then an employee of the China Operations Committee of Johnson Wax, Inc., also attended the meetings. During the first day of the conference, which MU did not attend, Drab urged the Ministry of Light to deal directly with Porelon for the sale of Perma-Stamps in China. Drab conceded at trial that he encouraged the Ministry of Light to breach any exclusive agreement it had with MU. On the second day of the meeting, which MU attended, a verbal agreement was reached whereby MU was granted an exclusive distributorship of Porelon premix into China and the distributorship for Southeast Asia. Porelon agreed to supply technical support to MU employees

9. Pail price concept differed from FHC's agreement in that MU would pay a flat rate per pail for the premix rather than a sales royalty.

10. His plan would have breached the licensing agreement with FHC, since the existing contract provided FHC with the exclusive right to manufacture (and sell) the licensed products in the authorized territory (Hong Kong). The definition of "licensed products" specifies that they are the handstamps made with Porelon's Knowhow (irrespective of the brand name). Therefore, the manufacture of handstamps utilizing Porelon's technology in Hong Kong would have breached the contract, regardless of whether the Perma-Stamp name appeared on the product. Likewise, when Ooms provided the imported stamps to MU for sales, the agreement was breached, since FHC held the exclusive license to sell the licensed product in Hong Kong.

11. The Ministry of Light Industries is a branch of the Chinese government which regulates industry.

in Hong Kong, teaching them proper manufacturing techniques.[12] MU promised to terminate its business relationship with Polypore in exchange for the commitments made by Porelon. At MU's insistence, Porelon agreed to terminate FHC's exclusive license in Hong Kong. An abundance of circumstantial evidence exists in support of this finding. Ooms' telex to MU on March 13, 1985, discloses: "I want you to know that behind the scenes, we followed through on the activities we discussed in Beijing. In the meantime, I hope that you will do the same with regard to your promise on the Polypore issue." Neither Ooms nor Drab were able to explain what "behind-the-scene" activities were carried out. A May 15, 1985, telex from Jim Chen to Ooms sheds some light, however, stating that Lam is furious over the legal complications regarding the FHC licensing agreement and that Lam suggests alternatively that MU be made a premix distributor in Hong Kong so that FHC would have to depend on MU for its supply of raw materials. Lam's demands were met swiftly by Porelon, since on May 28, 1985, MU announced that it was Porelon's sole distributor of raw materials for making Perma-Stamp in Hong Kong, Macao, Red China, Indonesia, Taiwan, South Korea, Thailand, Singapore, Malaysia, the Phillipines and Borneo. A distributor agreement dated May 10, 1985,[13] provides that MU has the exclusive right to sell and distribute Porelon's premix, inks, equipment and supplies in the countries listed above. When FHC expressed its dismay at MU's announcement, Drab responded on June 4, 1985, in a letter confirming MU's announcement and directing FHC to purchase premix from MU.[14] The letter, however, reassures FHC that the

decision, in no way, should be taken that Porelon is dissatisfied with Fen Hin Chon in marketing Perma-Stamp handstamps in Hong Kong. Fen Hin Chon has been a loyal customer and Porelon has always valued our business relationship.

Less than two months after MU's appointment as Porelon's distributor, Mark Universal began withholding supplies from FHC. On June 27, 1985, when Drab telexed Lam directing MU to supply FHC in a timely manner in an effort to avoid legal recourse by FHC, Lam replied that MU *intended* to control FHC's supply of premix. MU's independent manner and refractory attitude toward Porelon reveals how much control they held over decisions which should have been solely in Porelon's discretion. The most damning evidence of MU's demands and Porelon's resultant crusade to end FHC's exclusivity in Hong Kong is Lam's July 12, 1985, telex to Ooms which provides:

The royalty issue is not important, what is important is Hong Kong and China. Hong Kong is Fen Hin Chon Know-how issue. We will be out of premix. Either Fen Hin Chon change their agreement with you on the Know-how or there is no alternative except to cancel them out. If there remains no decision and action, Porelon is leaving us no choice. China is still unhappy with what Fen Hin Chon is still doing in China and have strongly suggest we cancel Fen Hin Chon soonest possible.

In terms of accounting on royalty, we have no problem. Our main concern is Fen Hin Chon agreement cannot remain unchange and decision have to be made. [sic]

Seven days later, on July 19, 1985, Ooms wrote a letter to FHC declaring a termi-

12. On May 16, 1985, Russ Moss, a chemist employed by Porelon, gave Lee of MU a demonstration of Porelon's new SP system. Ooms gave an SP demonstration at MU's facility in Hong Kong during the week of April 15, 1985. Porelon's manufacturing manuals containing technical "Know-how" were also provided to MU during this time.

13. The agreement was actually signed weeks later and backdated since Lam's May 29, 1985, telex to Drab and Ooms states that MU is still waiting to receive the license agreement. MU's premature announcement of the distributorship is a classic example of their brazen, defiant style of doing business.

14. FHC was forced to pay MU a "special handling fee," resulting in a higher price for Porelon premix.

nation of their licensing agreement if certain alleged breaches were not remedied. The letter addressed three areas of concern: FHC's sales of premix into China; the quality of the handstamps produced by FHC; and the improper use of the name Johnson Wax in FHC's advertising. FHC responded on August 9, 1985, requesting more specific information as to alleged sales outside their authorized territory, expressing surprise at the quality complaints, and agreeing to cease using the Johnson Wax name. Additionally, FHC advises Porelon that MU is refusing to supply them with premix and they once again requested to be supplied, this time warning that their operations were at a standstill.

On July 16, 1985, Ooms set up a meeting between Jim Chen, FHC, and MU for the following week. In a telex to Lam, Ooms arranged for Chen and Lam to meet privately before the joint meeting to discuss the "strategy." After repeated requests from FHC for premix on July 22, 1985, and August 5, 1985, Porelon finally, on August 13, 1985, instructed MU to supply FHC immediately.[15] On August 14, 1985, FHC commenced this lawsuit. On the same day, Drab executed an agreement on behalf of Porelon guaranteeing timely deliveries in Hong Kong of future premix orders to FHC. On August 19, 1985, Ooms assured Lam that Porelon would furnish MU with material *to produce*, a statement which is highly convincing proof that Porelon was preparing MU to function as a manufacturing facility to replace FHC. MU remained oposed to supplying FHC (suggesting on August 23, 1985, that Porelon authorize MU to inspect FHC's factory and books), but the premix was eventually delivered to FHC on October 3, 1985.[16]

15. Porelon had been contacted by attorneys representing FHC at this point.

16. The extreme delay in delivery was the result of a combination of factors—quality problems at the Porelon plant, a mid-Autumn festival in Hong Kong, and MU's refusal to cooperate in deliveries.

17. MU repeatedly informed Porelon that the Ministry of Light Industries was upset with FHC for selling into China. Regardless of the Minis-

## 1. *Alleged Sales into China by FHC*

Careful scrutiny of the complaints voiced by Porelon in their July 19, 1985, "breach" letter to FHC reveals their pretextual nature. The objections raised by Porelon were unsubstantiated excuses to avoid FHC's exclusive contract, in a concentrated effort to placate MU and preserve the China opportunity. Porelon's foremost argument in justifying the termination was that FHC was selling premix into China in violation of Porelon's licensing agreement.[17] The proof establishes two sales into China. The first, a sale of three pails of premix, occurred prior to Ooms' April 1985 telex which expressly prohibited sales of Porelon premix directly or indirectly with companies in China. The three pails of premix (one black, one blue, and one red) were sold as samples to companies in China in reliance upon Porelon's November 1983 letter which authorized FHC to explore the Chinese market.[18] FHC's licensing agreement tacitly prohibits the sales of Porelon premix by qualifying the license to manufacture licensed products, as nonassignable, a provision which impliedly restricts the right to resell raw materials such as premix. However, Porelon effectively waived this restriction, at least to the extent that FHC could transfer such products as were reasonably necessary to develop the Chinese market for handstamps, when it authorized FHC to explore China's possibilities in November of 1983, and reaffirmed that authority in March 1985. Therefore, the court finds that FHC's three-pail sale did not constitute a breach of its licensing agreement.

The second sale into China, of manufacturing equipment and raw materials for handstamp production, occurred in two phases, with invoices dated May 22, 1985,

try of Light Industries' disdain toward FHC, the proof shows that the sales which occurred did not violate FHC's obligations to Porelon pursuant to the licensing agreement.

18. Additionally, as late as March 4, 1985, Porelon encouraged FHC to provide them with information such as volume commitment and marketing plans regarding FHC's ability to develop the market in China.

and June 4, 1985. The contracts provided for Porelon materials to be sold, but the credible proof establishes that these orders were filled with Wilsolite [19] materials due to Porelon's orders to FHC not to sell into China. It is reasonable to infer, as Wilson Tse testified, that the contract for the sale of an entire production line had been negotiated prior to Ooms' April 1985 moratorium on sales to Chinese companies. Moreover, since these contracts did *not* result in the sale of any Porelon materials, it is axiomatic that no breach of the licensing agreement occurred thereby.

■ Much ado was made at trial about Jim Chen's purchase of a Perma-Stamp custom stamp at an FHC shop in Shenzhen, China, after the April 1985 demand that FHC not sell into China. It is crucial to note, however, that FHC was free to sell finished products in China at that time, and were restricted only as to *premix* sales. Therefore, Chen's purchase and the operation of the chop shop is irrelevant on the issue of FHC's alleged improper sales into China.

### 2. Alleged Quality Problems with FHC Products

■ In May 1983, Ross Moss, a Porelon chemist and a "troubleshooter" for quality problems, visited FHC's operations in Hong Kong to assist them in remedying a problem with wet violet stamps. Following his inspection, Moss termed the quality of FHC's stamps as "good" and made a number of recommendations regarding manufacturing techniques. David Hedgecoth, Product Development Manager at Porelon, followed up Moss' assessment with a letter to FHC in which he complimented the overall quality of FHC's stamps as very good and made several suggestions based on Moss's memo. The violet premix was subsequently reformulated due to a number of complaints by other licensees. No other negative comments were made to FHC regarding product quality until after Drab and Ooms' visit to Hong Kong in January 1985, when they met with MU and the Ministry of Light. They also visited FHC's

factory and returned home to write letters criticizing some of FHC's methods. Again, the violet premix was the grievance. Obviously, at this point in time, Porelon, feeling pressure from MU to cancel FHC, had ulterior motives in finding quality problems at FHC's factory. Hedgecoth, who examined a stamp made by FHC during this period, stated that "[i]t looks very good, and I have no concerns about the quality." Moss conceded that the quality of FHC's production did not decline in 1985 and 1986 but was comparable to 1982 and 1983. We find Porelon's claim of quality problems at FHC as justification for termination to be unworthy of credence.

### 3. Alleged Improper Use of "Johnson Wax" Trademark

■ Porelon's insertion of a trademark infringement claim in their breach letter to FHC is manifestly pretextual and requires little discussion. Prior to Porelon's July 19, 1985, letter to FHC, FHC had *never* been instructed not to use the Johnson Wax name. In April 1983, FHC provided Porelon with an expansion plan for Perma-Stamps which included a reproduction of FHC's advertising logo, stating in bold print "developed by Johnson Wax." The ad generated no objections. In May 1985, Mazfa Enterprises, Porelon's Taiwanese licensee, used the "Johnson Wax" name on their stationery in a letter to Porelon. Their use of the Johnson Wax trademark was acquiesced to by Porelon only two months before Porelon claimed the same behavior by FHC was grounds for terminating their contract. Lastly and determinatively, at the time of trial FHC *still* used the "Johnson Wax" name in their advertising for their Indonesian operation without protest from Porelon.

On August 20, 1986, Porelon advised FHC that they were terminating FHC's license since FHC had not remedied the breaches of contract as set forth in their July 19, 1985, letter. After August 20, 1986, Porelon refused to supply FHC with premix.

---

19. "Wilsolite" is the name brand of a rubber-  based premix.

The subterfuge and facade of the complaints in Porelon's "breach" letter are further exposed by the following excerpts from the deposition testimony of Drab:

A. ... We had the China opportunity that I was personally interested in exploring for the good of Porelon; and we had a long-standing relationship with Fen Hin Chon; and I was interested in preserving that. I had no vendetta at all against the Fen Hin Chon organization or the people. They were great people to deal with over the years as businessmen and as individuals. *We had a basic difference in philosophy on how to grow the market at that point in time; and had the China opportunity never came along, I doubt if anything would have ever even come up because at the point in time that we made our decision and extended the Fen Hin Chon contract for five years to the balance of 1989,* we had no contact at all with Mark Universal and just normal relations with Fen Hin Chon; *but then along came the China opportunity; and with the Ministry of Light Industry insisting to deal through Mark Universal, you know, the thing got so dang complicated that it drove everybody nuts.*

. . . .

Q. Were the items about quality and using the term "Johnson Wax" just put in to beef the letter up?

A. *It could have been.* I didn't participate in that discussion that actually generated the letter that went out. (Emphasis added.)

Additionally, the day before the final termination letter to FHC, Drab's interoffice memo to T.S. Malone contains the following language:

CONSIDER THE LICENSEE AGREE-MENT WITH FEN HIN CHON TERMI-NATED AND WORK CLOSELY WITH MARK UNIVERSAL

I have reviewed this action with Russ Barron and he supports official termination of our license agreement with Fen Hin Chon. Therefore, an official letter notifying Fen Hin Chon of the termi-

nation of the agreement will be sent via certified return receipt mail (copy attached). This may lead to further legal action by Fen Hin Chon, but *I believe it's a business risk we must take.* (Emphasis added.)

The termination of FHC by Porelon related not to China sales, quality, or the Johnson Wax name; it was a simple matter of dollars and cents to Porelon. The business risk they deliberately chose to take is now one for which they must pay.

F. *Evernice Investment, Ltd.*

At the time of Porelon's August 20, 1986 termination letter, FHC had enough premix on hand to continue production until approximately November 1986. On December 1, 1986, FHC sold its manufacturing equipment, inventory, and supplies to Evernice Investment, Ltd., (hereinafter Evernice) for HK $837,785.84 or US $107,-408.44,[20] a figure arrived at by an independent appraisal. The purchase price was financed by FHC, with a HK $300,000 down payment and quarterly installments with interest at 2 percent above prime. Evernice is owned by Edison Tse (40 percent), K.W. Hau (20 percent), and Chia Hian Hoen (40 percent). Evernice agreed to assume all severance pay obligations for FHC's entire labor force amounting to approximately HK $800,000 or US $102,564. Evernice operates in the same facility as FHC, and employs the same workers. Mr. K.W. Hau is the manufacturing manager for Evernice. Evernice licensed the trademarked jumping frog logo from FHC for 5 percent royalty of the net wholesale list price of any product bearing the logo. Evernice obtains premix from U.S. Business Stamp, which distributes Polypore premix. Evernice was operating the hand-stamp manufacturing facility at the time of trial as a profitable venture. However, Dr. Edison Tse expressed genuine doubts about whether Evernice would continue to be supplied by U.S. Business Stamp following transcription of the record in this case, since MU would then learn of Evernice's premix source. From the evidence present-

---

**20.** One U.S. dollar equals 7.8 Hong Kong dollars.

ed in this case regarding MU's influence, the court views Dr. Tse's anxiety as fully justified.

FHC remains in existence, carrying on the trading import-export business and the distribution of stamp mounts. They continue to hold the Indonesian license for Porelon products, although FHC indicated that Porelon presently owed them royalties from Indonesia.

## II. CONCLUSIONS OF LAW

While the factual findings in this case are myriad and detailed, the legal conclusions to be drawn therefrom are few and simple.

In late 1982 and early 1983, a valid licensing contract was in force between Porelon and FHC, granting FHC an exclusive license to make and sell the licensed products in the authorized territory (which included Hong Kong). The plaintiff argues that Ooms' actions in providing the catalogs and zinc plates to MU was an improper grant of Know-how in violation of the contract. FHC also claims that the arranged importation of licensed products (Perma-Stamps) from Singapore to MU breached FHC's exclusivity rights. Additionally, FHC contends that Ooms' conspiracy to terminate them was a breach of the implied covenant of good faith and fair dealing inherent in every contract.

■ A strict construction of the contract terms compels the conclusion that "know-how" was unprotected and nonexclusive in November 1982, when Ooms provided MU with technical knowledge. The act was deceitful and detrimental to FHC, but it did not breach the existing contract. Porelon's importation of licensed products from Singapore to Hong Kong did, however, violate FHC's exclusive license to make and sell licensed products [21] in Hong Kong, resulting in the lost sales and reduced profits as addressed hereinafter.

A second breach of FHC's licensing agreement occurred on August 20, 1986, when Porelon ceased providing premix to FHC, advising them that license had been terminated for several professed reasons, all of which have been adjudged as pretextual. The deprivation of FHC's right to produce and sell Perma-Stamps resulted in the flow of substantial damages in the form of lost profits from December 1986 through December 1989.

## III. DAMAGES

### A. *The Interference.*

■ In late 1982 and early 1983, Porelon's assistance enabled MU to become quickly established as FHC's competitor. The combination of Ooms' informative consultations, Porelon's supply of handstamps from Singapore, and their refusal to correct MU's false advertising enabled MU to retain practically all the sales it had previously made on behalf of FHC. Absent Ooms' involvement, MU's business would have been interrupted for at least several months, when FHC terminated them. Since there was no competing manufacturer of pre-inked handstamps in 1983, MU's salesmen would have been *unable* to fill orders, forcing them out of the market, had MU not been ready to manufacture, thanks to Ooms and Porelon.

Porelon contends that FHC's lost sales in 1983 and 1984 was the direct result of their termination of MU and its effective salesmen. Such an argument is incongruous, however, with the fact that FHC would have been the *only* manufacturer of pre-inked stamps when it fired MU had Ooms not informed MU of the impending termination, and had MU been faced with the delay of the average set-up time.[22] We recognize, however, that some former MU customers would not have immediately become FHC customers and that without

---

**21.** "Licensed products" are defined *supra* and do not necessarily bear a trademark name. Therefore, since the imported stamps were produced using Porelon Know-how, they were licensed products, regardless of whether they bore the Perma-Stamp name.

**22.** Set-up time for a new manufacturing of handstamps was a much-disputed issue, but is at least several months to a year. Ooms testified that a new licensee requires about three years to "get his feet on the ground."

Ooms' help, MU would have become operational by 1984, recapturing some of FHC's customers. We therefore attribute 75 percent of FHC's lost sales in 1983 and 1984 to Porelon's breach of contract. The record does not support the designation of damages from FHC's lower sales volume in 1985 and 1986 to Porelon's breach, as the plaintiffs contend. The proof shows lost sales volume of HK $1,289,368 in 1983 and HK $978,974 in 1984,[23] 75 percent of which amounts to HK $967,026 for 1983 and HK $734,230 for 1984.

The lost sales damages sustained by FHC shall be calculated using a profit margin of 22.84 percent, which represents FHC's average actual historical profit margin. Dr. Tse established a projected profit margin of 28.25 percent by using sales figures which would have resulted if FHC's sales had been uninterrupted.[24] Dr. Tse's projections as to profit are somewhat flawed, however. A number of expense items are allocated solely to the "office" ledger (for the import/export branch of FHC), which results in an artificially high profit margin.[25] FHC's profit and loss statements reflect that the "office" (the import/export business) sustained a loss in each year from 1980 through 1985. The substantial "losses" in 1982, 1983 and 1984 are exaggerated at best, reflecting manipulative accounting procedures, which results in the higher actual and projected profit margins in those years.

The damages for lost sales in 1983 and 1984 of HK $967,026 and HK $734,230, or US $123,978 and US $94,132, respectively, using a profit margin of 22.84 percent, amounts to US $28,317 for 1983 and US $21,499 for 1984.

**23.** We rely on Dr. Tse's projections of sales volume for 1983 and 1984. The defendants' expert, Dr. Moore, estimated a slightly higher figure for lost sales.

**24.** The profit margin would have increased with sales volume since fixed costs are absorbed at a certain level and beyond that point only variable costs are relevant in calculating profit.

**25.** The misallocated items include advertising, postage, telex, entertainment, and travel. The

## B. *The Final Breach.*

As fully discussed *infra,* Porelon's cessation of premix to FHC in November 1986 was unjustified and a breach of the licensing agreement.

In order to calculate damages for lost sales through the balance of the licensing agreement, December 31, 1989, we shall utilize the forecast for FHC's growth prepared by Porelon before the initiation of this litigation. Porelon predicted that FHC would grow at a rate of 23 percent in 1987 and 14.63 percent in 1988.[26] A growth rate of 14.63 percent, while not forecast, is reasonable for 1989 (and was used by the defendants' expert in his calculations). Application of the above growth rates results in projected sales of HK $365,004 for December 1986; HK $5,387,462 for 1987; HK $6,175,647 for 1988; and HK $7,079,144 for 1989. The lost sales total HK $19,007,257. At a profit of 22.84 percent, lost profits total HK $83,357 or US $10,687 for December 1986; HK $1,230,346 or US $157,737 for 1987; HK $1,410,346 or US $180,814 for 1988; and HK $1,616,680 or US $207,266 for 1989.

An award of prejudgment interest is proper on the damages sustained in 1983 and 1984 from the first breach. Using an interest rate of 6.5 percent as suggested by Dr. Tse and which the court finds conservative for the years of 1984, 1985 and 1986, the 1983 award of US $28,317 with interest of 6.5 percent compounded annually totals US $35,687; and the 1984 award of US $21,499 with interest of 6.5 percent compounded annually totals US $25,441.

The damages award for the second breach include interest on past lost profits, and future lost profits shall be reduced to present value, both using an interest rate

record does not enable the court to make an accurate, valid reallocation; and FHC is therefore, relegated to its actual profit margin of 22.84 percent.

**26.** Since FHC had exceeded Porelon's expectations in every year prior to 1983, it is fair, and indeed conservative, to use these forecasted growth rates.

of 6.5 percent. Therefore, damages from December 1986 of US $10,687 shall be increased by interest of US $463 [27] for a total of US $11,150. Damages for 1987 of US $157,737 shall not be adjusted. The lost profits for 1988 of US $180,814 shall be reduced to a present value of US $166,286.53, and the lost profits for 1989 of US $207,266 shall be reduced to a present value of US $178,979.57.

## C. *Mitigation of Damages.*

It is an established principle that when there has been a breach of contract, definite and entire, the injured party must do what fair and reasonable business prudence requires to save himself and reduce the damage, or the damage which arises from his own negligence will be considered too remote for recovery. While a party to a contract is bound to use all proper means and efforts to protect himself from loss and can charge only such damages as, by reasonable endeavors on his part, could not have been prevented, wide latitude of discretion must be allowed to the injured person who by the wrong of the contract breaker has been forced into a predicament where he is faced with the probability of injury or loss, and only the conduct of a reasonable man is required of him in an attempt to mitigate damages. The critical factor in determining fulfillment of the duty of the plaintiff to mitigate damages on breach of contract by the defendant is whether the method which the plaintiff employed to avoid consequential injury was reasonable under the circumstances existing at the time. The plaintiff, who is required to mitigate damages on breach of contract by the defendant, is not in the same position as an accounting trustee, and the defendant cannot examine into the minutiae of the plaintiff's operations or insist on perfection. The rule with respect to mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely to show that the injured party might have taken steps which seemed wiser or would have been more advantageous to the contract breaker. However, the burden of showing that the plaintiff could have mitigated his damages after the defendant's breach of contract is on the defendant.

9 Tenn. Juris. *Damages*, § 19 (1983).

■ Porelon contends that FHC failed to properly mitigate damages by closing down the factory operation and selling it to Evernice. More specifically, Porelon argues that Evernice is truly the alter ego of FHC, that Evernice is now operating at a profit with sales growth, and that, therefore, FHC should be denied an award of damages, with the proviso that Porelon be ordered to provide premix to Evernice if Evernice loses its existing source or has quality problems with the premix. After analysis of the facts and relevant legal principles, the court rejects Porelon's contention.

■ First, the court declines to label Evernice as the alter ego of FHC. FHC was owned and operated primarily by the Tse and Han families. The ownership was widely scattered within the family, with sisters and cousins owning varying percentages of stock. Evernice's owners, Edison Tse, K.W. Hau, and Chia Hian Hoen, owned only a combined 32 percent interest in FHC. A bona fide sale of the business occurred, based on an unimpeached appraisal value, of HK $837,785.84 with a down payment of HK $300,000, and ten quarterly installments with interest thereon at the rate of 2 percent above prime. The sales agreement contains a detailed list of equipment and inventory, with separately assigned values. Additionally, Evernice assumed the entire liability for the severance pay from the labor force which was shown to be a consequential sum. They licensed the jumping frog logo for 5 percent of gross sales, an amount which is not excessive in light of FHC's extensive promotion and resulting recognition of the logo and its connection with the Perma-Stamp name. Employing the same workers and the same factory manager at the

---

**27.** This figure represents 8 months of interest at 6.5 percent.

**1188**

same facility is irrelevant with regard to the alter ego theory.

Second, in determining whether FHC was reasonable in selling its business rather than attempting to continue, it is essential to view the future from FHC's perspective in November 1986. At that point in time, FHC was faced with the immediate obstacle of fighting the superiority of the Perma-Stamp brand name which it had worked so hard to establish.[28] When MU entered the market, FHC warned consumers to "beware of substitutes." The Hong Kong market had been indoctrinated by FHC to believe that Perma-Stamps were the best; an "about face" by FHC would have been difficult at best. Additionally, and perhaps more importantly, FHC exercised grave doubts as to a continued supply of quality premix. At that time, only Porelon and Polypore were the dominant licensors. Polypore's shrinkage factor was a major concern to FHC (10–15 percent as compared to 2–3 percent for Porelon) because signature stamps would incur distortion, rendering them useless. Additionally, Polypore stamps sweat in the Hong Kong climate. Although Porelon points to Evernice's profit and growth as indicative of what FHC could (and should) have accomplished, a history of less than one year is highly inconclusive since their customers will not notice the above problems until the Evernice stamp is several months old. The reorder rate is therefore likely to be low. Moreover, all parties agreed that the disclosure at trial of Evernice's supplier, U.S. Business Stamp, which supplies Polypore material, would probably result in an interference of supply caused by MU since MU now holds the exclusive rights to the use of Polypore in Hong Kong. Therefore, Evernice's short-term success does not enable Porelon to carry its burden that FHC was unreasonable in selling out. Furthermore, when confronted with going to the same market place with a new product manufactured from Polypore, FHC could not have explained away its previous adver-

tisements that it was an inferior product. Evernice's assumption of liability for severance obligations by FHC to its employees reduced FHC's damages by approximately US $102,500.

CONCLUSION

Porelon is guilty of breaching its licensing agreement with FHC in two separate episodes. The plaintiff's damages for 1983 and 1984 (including interest) which are directly attributable to the first breach are US $35,687 and US $25,441, respectively. The plaintiff's damages from the second and final breach are as follows: For December 1986, US $11,150 (including interest); for 1987, US $157,737; for 1988, US $166,286.53, (which amount has been reduced to present value); and for 1989, US $178,979.57 (which amount has been reduced to present value). The defendant has failed to carry the burden of showing that the plaintiff did not properly mitigate damages. Therefore, an appropriate order shall be entered in favor of Fen Hin Chon against Porelon, Inc., in the amount of $575,281.10.

---

**28.** Swedpoint, Porelon's subsidiary, prohibited FHC from continuing to use the orange handle which FHC always had used in the production of Perma-Stamps. Naturally, and according to

expert testimony by Porelon's witness, the company using the orange handle and the Perma-Stamp name was apt to get the repeat business. That company is currently MU.