Dr. Lani FORD, et al.,
Plaintiffs–Appellees,

v.

Chancellor Roy S. NICKS, et al.,
Defendants–Appellants.

No. 88–5260.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 7, 1988.

Decided Jan. 30, 1989.

Rehearing Denied April 11, 1989.

Charles Hampton White (argued), Richard Colbert, Cornelius & Collins, Nashville, Tenn., for plaintiffs-appellees.

W.J. Michael Cody, Atty. Gen., Christine A. Modisher (argued), Mary E. Walker, Asst. Attys. Gen., Nashville, Tenn., for defendants-appellants.

Before NELSON, Circuit Judge, and PECK and LIVELY,[*] Senior Circuit Judges.

DAVID A. NELSON, Circuit Judge.

In 1971–72 plaintiff Lani Ford, a former secondary school mathematics teacher, was an assistant professor of education at Middle Tennessee State University (MTSU) in Murfreesboro, Tennessee. She was not rehired for 1972–73, and she brought a sex discrimination suit against MTSU, the Chancellor of the State University, the members of the state board of regents and others under Title VII of the Civil Rights

---

[*] The Honorable Pierce Lively became Senior Circuit Judge January 1, 1989.

Act of 1964. The district court, sitting without a jury, found in favor of Dr. Ford. The court awarded her back pay for a period beginning in 1972 and ordered that she be appointed to a full professorship with tenure.

The defendants filed a notice of appeal captioned "Dr. Lani Ford, et al., Plaintiffs, vs. Chancellor Roy S. Nicks, et al., Defendants." The body of the document gave notice of an appeal by "the defendants." The form of the notice of appeal raises a question as to the jurisdiction of this court over any defendant other than Chancellor Roy S. Nicks. See *Torres v. Oakland Scavenger Co.*, 487 U.S. ——, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), and *Van Hoose v. Eidson*, 450 F.2d 746 (6th Cir.1971).

As to the merits, the defendants argue on appeal that the district court's finding of intentional sex discrimination was clearly erroneous, as was the court's finding that Dr. Ford had mitigated her damages. The defendants contend further that the district court abused its discretion in ordering the university to reinstate Dr. Ford as a tenured professor and in awarding her back pay for a decade and a half.

We have concluded that all of the defendants are properly before us on appeal, and that the record amply supports both the district court's finding of impermissible sex discrimination and the decision to order reinstatement. We think the district court abused its discretion in awarding Dr. Ford tenure, however, and it seems to us that the district court's resolution of the mitigation of damages issue was clearly erroneous. We shall therefore affirm the judgment in part and reverse it in part.

I

Dr. Ford and her husband, William Ford, both completed graduate studies at Michigan State University in 1970. Mr. Ford received a Ph.D. in business education in the spring of that year, and Mrs. Ford received a Ph.D. in secondary education some months later.

Mr. Ford, who was seeking employment as a professor of business education, was interviewed by the chairman of the MTSU Department of Business Education, Elwin W. Midgett. Mr. Midgett offered Mr. Ford a job as associate professor of business education for the 1970–71 academic year at a salary of $14,040 per year. Mr. Ford accepted the offer.

At the interview with Mr. Midgett, as well as in meetings with other MTSU officials, Mr. Ford expressed a desire to find a position for his wife. Mr. Midgett reported that there were four teaching vacancies in the sociology department, and Mrs. Ford sent a copy of her resume to that department. Mr. Ford, for his part, contacted Ralph White, chairman of the MTSU Department of Education and Library Science, to inquire about the possibility of a job for his wife.

The Fords moved to Murfreesboro in the summer of 1970, before Mrs. Ford had received her Ph.D. degree. After her arrival Mrs. Ford got in touch with Mr. White directly. Mr. White told her that she could not be considered for a position in his department until she had received her doctorate.

In October of 1970 Mr. Ford asked Mr. White about his wife's prospects for employment after she had her doctor's degree. Mr. White responded that the university did not hire wives of faculty members for academic positions.

Mrs. Ford qualified for her Ph.D. in December, and again she approached Mr. White about a job. Mr. White offered her a part-time, nonfaculty teaching job paying significantly less than faculty positions. He also suggested that she apply for work as a secretary and asked her how many words per minute she could type. He told her that being married to a faculty member was a "problem," and that she could not expect to become a regular member of the faculty herself. Mrs. Ford declined the offer of a part-time job, as well as the invitation to apply for work as a secretary.

In the summer of 1971 the Fords met with the president of the university, M.G. Scarlett, to discuss their concerns. Mr. Scarlett then asked various university officials to consider hiring Mrs. Ford with

"soft money," *i.e.,* funds from outside sources not included in the regular state university budget.

On August 17, 1971, Mrs. Ford was offered a position as assistant professor of education at a salary of $11,100 per year, with all regular faculty benefits. The proposed contract said that her salary was being paid by an outside source and that there was "no commitment expressed or implied" that she would be rehired at the end of the year. Mrs. Ford accepted the job and taught several introductory courses, as well as supervising student teachers. Mr. White rated her work as "satisfactory," but stated that he would be reluctant to hire her permanently because her specialty was in the field of secondary education.

During the 1971–72 academic year the MTSU Department of Education and Library Science had 40 to 42 full-time faculty members, of whom six, including Mrs. Ford, were in their first year. All of the other first-year people were men. The total number of men in the department came to 34 or 35.

Two male teachers who started at the same time as Mrs. Ford were paid from the same "soft money" as she and taught the same introductory courses. Both of these men resigned at the end of the 1971–72 academic year. Mrs. Ford wanted to continue teaching but was not offered a position. When Mrs. Ford tried to inquire about the possibility of being hired to fill one of the vacancies created by the departure of the male teachers, Mr. White did not return her phone calls. When she asked the university president to intercede on her behalf, she was told that all the positions had been filled.

The Department of Education and Library Science hired eight new professors for 1972–73. Seven of the new people were men, and one of them, Douglas Knox, did not yet have a doctorate. Mr. Knox was working on an advanced degree, but it was an Ed.D., not a Ph.D. Although Mr. Knox was paid with "soft money," his contract did not contain the "no commitment" clause that had been in Mrs. Ford's con-

tract. Mr. White claimed at trial that Mr. Knox was better qualified than Mrs. Ford because his uncompleted Ed.D. degree was in the field of higher education, rather than secondary education, and because his brief experience as a non-tenure track geography instructor was more relevant than Mrs. Ford's longer experience as a schoolteacher, her additional experience teaching educational psychology at Michigan State, and (at the time Knox was hired) her one year of "satisfactory" teaching at MTSU.

Mrs. Ford gave birth to a child in the summer of 1973, but this did not prevent her from contacting both the Talent Bank of the Tennessee Governor's Commission on the Status of Women and the Tennessee Education Association late in 1973 to ask for their assistance in looking for an appropriate job. In addition, both Mr. and Mrs. Ford sent out resumes to institutions throughout the United States, Mr. Ford's contract not having been renewed at the end of the 1972–73 school year.

Their efforts were not successful, and in the fall of 1974 Mr. Ford obtained a Tennessee real estate license and got a job at a local real estate company. He later started his own real estate firm.

Mrs. Ford applied for and was offered a position as assistant professor of education at Tennessee Technological University in Cookeville, Tennessee. This position involved supervising student teachers and teaching introductory education courses similar to the ones she had taught at MTSU. Mrs. Ford declined the offer, expressing concern about the distance between Murfreesboro and Cookeville (70 miles), as well as the additional driving that would be required in supervising student teachers at schools up to 60 miles away from Cookeville.

Mrs. Ford did not actively pursue academic employment opportunities after 1974. She never applied for employment at Austin Peay State University in Clarksville or the University of Tennessee at Chattanooga, two other nearby state universities, although there was evidence that both of those universities advertised numerous openings for entry level professors of edu-

cation in the mid–1970s. Mrs. Ford obtained a real estate broker's license instead and helped her husband, off and on, in his real estate business. She also worked briefly for another real estate company and for the Tennessee Energy Authority.

After obtaining a right-to-sue letter from EEOC, the Fords commenced an employment discrimination suit against MTSU in 1977. Mrs. Ford claimed that she had not been rehired because of her sex, while Mr. Ford claimed that he had not been rehired in retaliation for his attempts to help his wife pursue her discrimination claim. After a bench trial, the district court made detailed findings of fact and entered judgment for the plaintiffs. Both Fords returned to teaching posts at MTSU, by court order, in 1983–84, and the defendants appealed to this court. We affirmed the district court's judgment with respect to Mr. Ford's Title VII claim but reversed the judgment on Mrs. Ford's claim and remanded the case for a new trial on the ground that the district court had impermissibly placed the burden of persuasion on the employer rather than on the plaintiff. *Ford v. Nicks,* 741 F.2d 858 (6th Cir.1984), *cert. denied,* 469 U.S. 1216, 105 S.Ct. 1195, 84 L.Ed.2d 340 (1984) ("Ford I"). Mrs. Ford's 1983–84 teaching contract was not renewed.

Mrs. Ford's claim was retried in January of 1986. The district court entered judgment for Mrs. Ford on February 10, 1986, —— F.Supp. ——, and this appeal followed.

## II

Although the defendants' notice of appeal was timely filed, it does not contain the actual names of all defendants. The relevant portion of the notice reads as follows:

"DR. LANI FORD, et al., Plaintiffs, vs.

CHANCELLOR ROY S. NICKS, et al. Defendants.

### NOTICE OF APPEAL

Notice is hereby given that the defendants' [sic] appeal to the United States Court of Appeal for the Sixth Circuit from the order entered in this action on February 10, 1988."

■ Fed.R.App.P. 3(c) provides that "[t]he notice of appeal shall specify the party or parties taking the appeal...." Under this rule a federal appellate court has no jurisdiction over any party not specified as an appellant in the notice of appeal. *Torres v. Oakland Scavenger Co.,* 487 U.S. ——, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988). We must therefore consider whether any defendant other than Chancellor Roy S. Nicks has been "specified" as a party taking the appeal.

■ "The specificity requirement of Rule 3(c) is met only by some designation that gives fair notice of the specific individual or entity seeking to appeal." *Torres,* 487 U.S. at ——, 108 S.Ct. at 2409, 101 L.Ed.2d at 292. Standing by itself, the phrase *"et al.,"* as used after Chancellor Nicks' name in the caption of the present notice of appeal, does not give fair notice of what other defendant or defendants may have sought to appeal. *"Et al."* is an abbreviation that can signify either *"et alius"* (or *"et alia"*) (singular) or *"et alii"* (plural), so we cannot tell from the caption alone whether it was only one defendant in addition to Chancellor Nicks who was seeking to appeal or more than one. Because the Latin language has no article, moreover, the words *"et alii"* could mean either "and others" or "and the others," depending on the context. W. Bingham, *A Grammar of the Latin Language* (1863), § 18, p. 11. Even if the caption had referred to "Chancellor Roy S. Nicks, *et alii,"* therefore, we should still have been unable to tell, from the caption alone, whether all of Chancellor Nicks' co-defendants were seeking to appeal, or some number greater than one but less than all. See *Van Hoose v. Eidson,* 450 F.2d 746, 747 (6th Cir.1971) ("The term 'et al' does not inform any other party or any court as to which of the plaintiffs desire to appeal in this case").

In the case at bar, as it happens, the ambiguities inherent in the caption can be cleared up by reference to the body of the notice. English, unlike Latin, does have

articles, and the body of the notice filed on behalf of Chancellor Nicks *et al.* says that the appeal is being taken by "the" defendants. There are some 18 defendants, and the statement that "the" defendants are taking the appeal gives fair notice that all 18 desire to be appellants, not just some of them. (See *Williams v. Williams,* 25 Tenn.App. 290, 156 S.W.2d 363, 369 (1941), where the words *"et al."* were used to include all defendants.)

In the *Torres* case, by contrast, the body of the notice of appeal listed the names of 15 out of 16 plaintiffs as parties to the appeal. The name of the sixteenth plaintiff, Jose Torres, had been omitted through a clerical error. Mr. Torres argued that the use of *"et al."* in the caption was sufficient to indicate his intention to appeal, but the Supreme Court rejected this argument. Mr. Torres, the Court said, "was never named or otherwise designated, however inartfully, in the notice of appeal...." 487 U.S. at ——, 108 S.Ct. at 2409, 101 L.Ed.2d at 292.

The *Torres* Court translated the phrase *"et al."* as meaning "and others," rather than "and *the* others." In the context of the particular notice that was before the Court in *Torres,* this translation was impeccable. The best translation of the caption in the case at bar, however, would be "Chancellor Roy S. Nicks, and the others, Defendants," because the context shows that *"et al."* was intended to refer to all the others.

We think it would be manifestly improper for us to read the words "the defendants," in the body of the instant notice, as meaning Chancellor Roy S. Nicks only. The other defendants may have been designated somewhat "inartfully," to borrow the adverb used in *Torres,* but to say that they were not designated at all would be untrue.

All of the defendants having been designated as appellants, we are not free to dismiss any of them merely because the designation is inartful. The final sentence of Rule 3(c), as added in 1979, prohibits dismissal of an appeal "for informality of form" in the notice of appeal. The Advisory Committee Notes on the 1979 amendment state that "so long as the function of notice is met by the filing of a paper indicating an intention to appeal, the substance of the rule has been complied with." We are satisfied that "the function of notice" was met as to each of the defendants in this case by the filing of a notice of appeal on behalf of "the" defendants, without limitation. Accordingly, we shall address the merits of the university's appeal as well as the appeals of Chancellor Nicks and the other defendants.

### III

■ Our analysis of Mrs. Ford's claim against the university follows the usual framework for Title VII cases. If Mrs. Ford established a *prima facie* case of sex discrimination, which we think she clearly did, the burden shifted to the university to advance a legitimate, nondiscriminatory reason for failing to rehire her in 1972–73. See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The district court discusses two possible nondiscriminatory reasons: lack of funds and the availability of better-qualified professors with academic specialties better suited to MTSU's long-term needs. The supposed lack of funds is a straw man, this reason never having been seriously advanced at trial, and on appeal the defendants rely entirely on the second proffered nondiscriminatory reason for not rehiring Mrs. Ford. That reason is a colorable one, so the burden shifted back to Mrs. Ford to demonstrate, by a preponderance of the evidence, that the proffered reason was a pretext. See *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. The district court's resolution of this question is a finding of fact which may be reversed only if clearly erroneous. *Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

Before considering whether the university's position withstands scrutiny, it will be

useful to describe it in somewhat more detail. Historically, MTSU had been a state teacher's college serving Middle Tennessee. Students seeking certification as teachers took substantive courses in an academic department plus education courses in the Department of Education and Library Science. A small graduate program had been established by the early 1970s. It was expected that increasing emphasis would be placed on graduate teacher education and on "specialized" areas of teacher education. Nevertheless, all undergraduates in the teacher training program at MTSU were required to take a number of introductory courses and to do supervised student teaching.

MTSU insists that it consistently sought professors who could be competent both to teach their share of the introductory core courses and to teach "advanced" courses in such special fields as "reading, special education, administration and supervision media, [and] early childhood education." The chairman of the department, Mr. White, expected growing enrollment in such specialized courses and decreasing enrollment in more general courses. The university insists that all of the other new professors hired by the Department of Education and Library Science during this period were at least as qualified as Mrs. Ford to teach the introductory courses and were also qualified to teach specialized courses that Mrs. Ford was unqualified to teach. At times the university appears to concede that Mrs. Ford's specialty, "secondary education," was a legitimate, recognized specialty, albeit one it regarded as undesirable; at other times, Mrs. Ford is described as a "generalist" with no real specialty at all.

Although the arguments advanced by MTSU as to its need for faculty members with recognized, up-and-coming specialties and qualifications to teach certain advanced courses in those fields are superficially plausible, the school's concepts of "specialties" and of the qualifications necessary to teach them seem highly elastic. The school could and probably did stretch these concepts to come up with a post hoc rationalization of its position, as opposed to using them in a consistent way in making its actual hiring and firing decisions.

The notion that the field of education was so compartmentalized at MTSU that each applicant for an entry level faculty position there could fairly be said to have a single, clearly defined, recognized specialty is difficult to accept, particularly since almost none of the applicants for positions at the school had any previous university teaching experience. The school fails to make clear why "secondary education" is any more "general" a specialty than "foundations" or "elementary education" or "higher education," the specialties of various other new faculty members hired at the time it was decided not to renew Mrs. Ford's contract. Most of the starting professors' "specialties" appear to be nothing more than the topics of their doctoral dissertations.

The university claims that secondary education was a dying field and that a secondary education specialist would have been unqualified to teach anything but introductory courses. The university's computer-printed course schedules show, however, that the education department offered "advanced" courses with such titles as "Sec Meth–Math" (undergraduate and graduate sections), "Curr of Sec Sch" (multiple sections), and "Prob Sec Educ." According to the university's own evidence, the following new courses were *added* to the curriculum between 1970 and 1975, at the time when "secondary education" was supposed to be a dying field: "Curriculum in the Secondary Schools," "Secondary School Administration," "Secondary School Curriculum," and "Teaching in the Upper Elementary and Middle School." Surely Mrs. Ford, with her graduate school background in secondary education and with three and one-half years' experience teaching mathematics in grades 7–12, would not have been unqualified to teach at least some of these "advanced" courses.

We also find it significant that other faculty members' "specialties" were often ignored in making teaching assignments. Jerry McGee, hired in 1971 with a listed specialty of "educational administration,"

was assigned to teach courses in curriculum development, secondary school curriculum, and history of education. Gerald Baughman, whose specialty is given as "Elem./Curriculum," taught courses in math teaching methods, science teaching methods, and secondary school curriculum. Robert Eaker, whose specialty was "Curriculum/Instr. Supervision," taught courses in educational sociology and middle school administration. Helen Self, a "special education" specialist, taught the course in comparative education. William Strang, with a specialty in "Elem. Science/Math," taught a graduate level course in educational sociology. Whatever the actual content of these courses may have been, it is hard to believe that anyone capable of teaching high school mathematics could not have got herself up to speed on the subject matter about as well as the other newcomers were expected to.

Mr. White's statements about "qualifications" are also implausible. A comparison of Mrs. Ford's qualifications with those of Douglas Knox, one of the men hired in her stead, makes this clear. Mrs. Ford had completed her Ph.D. at Michigan State University; Mr. Knox had not yet completed the requirements of the Ed.D. program at the University of Southern Mississippi. Mrs. Ford had significant experience actually teaching children; Mr. Knox did not. Mr. White apparently put the subject of Mr. Knox's then-uncompleted dissertation, "higher education," on a higher plane than Mrs. Ford's subject, secondary education, and Mr. White thought that Mr. Knox's experience as a college level geography instructor was superior to Mrs. Ford's college level experience teaching education courses at MTSU, her college level experience teaching educational psychology at Michigan State University, and her three and one-half years' experience teaching real children in a real high school classroom. Like the district court, we are not impressed.

In addition to Mr. Knox, several other men without doctoral degrees were hired as professors during the relevant period. Although all were ostensibly hired because of the university's need for professors with their claimed areas of expertise, these men taught precisely the same introductory courses as Mrs. Ford. They were clearly no better qualified to teach the introductory courses than she was.

The university relies heavily on the testimony of Charles Myers, a professor of education at Vanderbilt, who opined that Mrs. Ford was unqualified to teach most of the education courses at MTSU and had an undesirable background as a generalist. In Mr. Myers' view, Mrs. Ford was unqualified to teach several courses that she actually did teach in 1971–72 and in 1983–84. The defendants offered no evidence that Mrs. Ford's performance in teaching these courses was unsatisfactory, and the district court was entitled to take that rather glaring omission into account in evaluating Mr. Myers' opinions.

It is also significant that Mr. Myers never examined the textbooks or course materials for any of the courses that Mrs. Ford was supposedly unqualified to teach; he relied exclusively on what he was told by the university's attorneys and on the one paragraph descriptions of the courses in the MTSU course catalog. Much of Mr. Myers' testimony consisted of reading a lengthy prepared statement, and if the district court was not bowled over by the acumen of this expert witness, we are in no position to evaluate the testimony differently.

Some of the statements of Mr. White also support the district court's finding of discrimination. At the time Mrs. Ford sought employment at MTSU, Mr. White referred to a university policy against hiring wives of faculty members for academic positions. The evidence at trial showed, however, no such anti-nepotism policy existed. There were, in fact, several married couples on the MTSU faculty at the time Mrs. Ford was told that her marriage to Mr. Ford stood in the way of her joining the Department of Education on a permanent basis. This casts doubt on Mr. White's credibility as a witness, and like his suggestion that Mrs. Ford look for work as a secretary, it supports the district court's finding that Mrs. Ford was treated less

favorably than other applicants for teaching positions because of her sex.

## IV

### A

42 U.S.C. § 2000e–5(g) adopts a traditional rule on mitigation of damages. That section provides, in pertinent part:

"Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable...."

The district court's finding on the issue of mitigation of damages is a factual finding reviewable under the "clearly erroneous" standard. *Rasimas v. Michigan Department of Mental Health,* 714 F.2d 614, 623 (6th Cir.1983), *cert. denied,* 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984).

The only Supreme Court case to address the mitigation of damages provision of 42 U.S.C. § 2000e–5(g) is *Ford Motor Co. v. EEOC,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), in which the Court stated that a plaintiff "need not go into another line of work, accept a demotion, or take a demeaning position." 458 U.S. at 231, 102 S.Ct. at 3065. The Court emphasized, however, that a plaintiff may not refuse a job "substantially equivalent to the one he was denied." *Id.* at 232, 102 S.Ct. at 3066.

■ *Rasimas,* the leading case on the subject in this circuit, teaches that the employer has the burden of demonstrating that there were substantially equivalent positions available with "virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status." The employer also has the burden of showing that the plaintiff failed to use reasonable care and diligence in seeking such positions. 714 F.2d at 624. The plaintiff's diligence must be evaluated in the light of the "individual characteristics of the claimant and the job market." *Id.* The mitigation requirement of § 2000e–5(g) also contains a more general element of reasonableness. An employee is not required to go to heroic lengths in attempting to mitigate his damages, but only to take

reasonable steps to do so. *Id.; United States v. Lee Way Motor Freight, Inc.,* 625 F.2d 918, 938 (10th Cir.1979); see also *NLRB v. Pilot Freight Carriers, Inc.,* 604 F.2d 375, 377 (5th Cir.1979).

■ At trial and on appeal the defendants have argued that there are three respects in which Mrs. Ford failed to mitigate her damages. First, they cite Mrs. Ford's conceded failure to seek work as a teacher in a secondary school, despite her previous secondary school experience. This argument has some appeal, but we cannot accept it in the context of a Title VII action. Mrs. Ford's duty to mitigate her damages did not require her to look for or accept employment substantially equivalent to any job she had previously held; she was under a duty only to look for and accept employment substantially equivalent to the job from which she was discriminatorily fired. *Rasimas,* 714 F.2d at 624; *Floca v. Homcare Health Services, Inc.,* 845 F.2d 108, 112 (5th Cir.1988) (experienced nursing director constructively discharged from that position in violation of Title VII not required to take offered position as registered nurse to mitigate her damages).

The defendants also emphasize Mrs. Ford's failure to seek a more lucrative real estate job. The evidence does seem to suggest that Mrs. Ford essentially abandoned the education field after 1974, except to the extent this lawsuit might restore her to her former position at MTSU. She took a real estate course and passed the Tennessee real estate broker's examination, obtaining a real estate broker's affiliate license and ultimately a full broker's license. Mrs. Ford testified as follows:

"Well, we thought the real estate business would be something we would be very interested in, and it was something where we could earn money quickly, and we felt it would be more profitable, say, than secondary teaching experience."

Other courts have suggested that when a Title VII plaintiff abandons one field for a new one, the duty to mitigate damages applies in the new field. See *Walters v. City of Atlanta,* 803 F.2d 1135, 1145 (11th Cir.1986) and *Ellis v. Ringgold School Dis-*

*trict,* 832 F.2d 27, 30 (3d Cir.1987) (recognizing significance of employee's abandonment of former profession but declining to find such abandonment on the specific facts presented).

The defendants' problem here, in our view, is that they failed to show what Mrs. Ford could have been expected to earn in the real estate business had she pursued that work actively and on a full time basis. Without evidence of the earnings foregone in real estate, the district court had no basis on which it could calculate a corresponding reduction in Mrs. Ford's back pay award. The district court appropriately declined to speculate on this matter.

The defendants argue, finally, that Mrs. Ford failed to mitigate her damages when she turned down a specific teaching position actually offered to her by Tennessee Technological University and when she failed to apply for other available positions in nearby colleges. The position at Tennessee Tech carried the same rank as the position at MTSU (assistant professor of education), involved very similar duties (supervising student teachers and teaching introductory courses), and paid slightly more than the MTSU job. The Tennessee Tech position would have required Mrs. Ford to drive somewhat longer distances from the Tennessee Tech campus in supervising student teachers than the MTSU position required her to drive from the MTSU campus, but Mrs. Ford's main complaint about the supervisory assignments she would have received at Tennessee Tech appears to be that they would require an especially long drive from Murfreesboro, not that the distances from Tennessee Tech itself would have been unacceptable.

■ In the job market for assistant professors of education in middle Tennessee, we find it difficult to imagine *any* position more closely comparable to the job at MTSU than the one Mrs. Ford turned down at Tennessee Tech. The two jobs were substantially equivalent, and unless Mrs. Ford's decision to reject the Tennessee Tech job was a reasonable one, monetary damages must be deemed to have stopped accruing as of the date on which she could have begun work at Tennessee Tech.

The record discloses that the Fords undertook a nationwide job search in 1974, sending employment applications to such far-flung institutions as the University of New Mexico, San Diego State University, and colleges in Georgia and North Carolina. Mrs. Ford admitted at trial that she and her husband were "willing to relocate" at that point. If the Fords were willing to consider moving thousands of miles away from Murfreesboro in 1974, we do not think it was reasonable for Mrs. Ford to decline a contemporaneous job offer at a university 70 miles from Murfreesboro. Tennessee Tech's Cookeville campus is close enough to Murfreesboro to make it feasible for the couple to have moved halfway between the two cities if Mr. Ford preferred to work in Murfreesboro.

This case is unlike several recent cases where an employee's rejection of an offer of a substantially equivalent job was held to be reasonable. In *NLRB v. Westin Hotel,* 758 F.2d 1126 (6th Cir.1985), a wrongfully discharged cocktail waitress had obtained a comparable job which she soon quit because of intolerable working conditions. These included, among other things, toilets and sinks that backed up and flooded the service bar every time it rained. We held that the waitress' refusal to continue to work under such conditions was reasonable, and we found that her failure to apply for comparable jobs located 25 miles from her home was reasonable in light of her inability to pay for necessary repairs to her car. *Id.* at 1130. In *Rasimas* we upheld a district court finding that the plaintiff had not acted unreasonably in refusing to interview for a job 223 miles from his home. 714 F.2d at 625. *Rasimas* and *Westin Hotel* are not controlling here.

Apart from her rejection of the Tennessee Tech job, Mrs. Ford failed to exercise reasonable diligence in applying for other substantially equivalent positions that were available. Witnesses from Tennessee Tech, Austin Peay University and the University of Tennessee at Chattanooga all testified that during the relevant period they

had numerous openings for assistant professors of education and that Mrs. Ford would have been qualified for these jobs. There were at least six and possibly as many as eight such positions at Tennessee Tech, apart from the single position for which Mrs. Ford did apply. There were 11 such positions at the University of Tennessee at Chattanooga, and two at Austin Peay. These jobs had pay, responsibilities and status comparable to Mrs. Ford's MTSU job. Mrs. Ford's failure to apply for these positions clearly constituted a failure to exercise the reasonable care and diligence required of her under *Rasimas.*

Mrs. Ford simply left the labor market for entry level professors of education in 1974 and made no further effort to obtain work in that field, apart from the prosecution of this lawsuit. She was perfectly free to make this choice, of course, but under § 2000e–5(g) she was not free to impose the costs of that decision on her former employer. We believe the district court's findings to the contrary are clearly erroneous.

### B

■ A successful Title VII plaintiff is presumptively entitled to reinstatement. *Henry v. Lennox Industries, Inc.,* 768 F.2d 746, 752 (6th Cir.1985); *Gutzwiller v. Fenik,* 860 F.2d 1317 (6th Cir.1988). The district court has wide discretion in fashioning an appropriate remedy for a Title VII violation, and the relief awarded is reviewed only for abuse of discretion. See *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 424–25, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

■ The university argues that Mrs. Ford is not currently qualified to become an assistant professor of education at MTSU. The university's argument as to her current qualifications rests largely on the expert testimony of Mr. Myers, who felt that Mrs. Ford had not kept up with developments in education and thus is not qualified to teach now. Mr. Myers' opinion is substantially undermined by Mrs. Ford's performance as an assistant professor in the year 1983–84, when she taught at

MTSU under court order. If Mrs. Ford was able to perform satisfactorily in 1983–84—and MTSU has failed to show she was not—we find it most unlikely that the year and a half that elapsed between that teaching experience and the retrial of this case made her any less qualified.

■ Although Mrs. Ford is clearly entitled to reinstatement, the question of reinstatement with tenure is much more difficult. The trial court did, to be sure, have broad discretion to fashion relief that would make Mrs. Ford whole. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Shore v. Federal Express Corp.,* 777 F.2d 1155, 1158–59 (6th Cir.1985). There is a general presumption in favor of reinstating discrimination victims at the level of seniority they would have attained had they remained in their jobs, moreover, *Franks v. Bowman Transportation Corp.,* 424 U.S. 747, 779 & n. 41, 96 S.Ct. 1251, 1271 & n. 41, 47 L.Ed.2d 444 (1976), but federal courts have traditionally been wary of interfering with academic tenure decisions. *Ford I,* 741 F.2d at 864; *Gutzwiller,* 860 F.2d at 1333.

If Mrs. Ford had been rehired in the fall of 1972, as she ought to have been, she would have been in the same position as other faculty members originally hired in the fall of 1971 and rehired the next year. To understand just what expectations of tenure such faculty members had, it is necessary to examine the relevant Tennessee statutes and the judicial decisions interpreting them.

In 1961 the Tennessee legislature enacted Tenn.Code Ann. § 49–1421, which authorized the State Board of Education to establish a system of tenure for college and university teachers under its jurisdiction. Pursuant to this statute, the State Board of Education promptly adopted the following regulation:

"Teachers shall be employed for the academic year annually during a probationary period of three (3) years after which time if their services have been satisfactory, they may become members of the permanent teaching staff. The proba-

tionary period may be extended or shortened upon recommendation of the president of the college subject to the approval of the State Board of Education."

Despite the regulation's permissive language ("may become"), the Tennessee Supreme Court has held that under the regulation "tenure was automatic upon the completion of a probationary period coupled with reemployment." *State ex rel. Chapdelaine v. Torrence,* 532 S.W.2d 542, 546 (Tenn.1975), *cert. denied,* 425 U.S. 953, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976).

In 1966 the State Board of Education purported to amend the regulation to lengthen the probationary period to five years. Employment contracts with university professors hired after 1966 were entered into on the assumption that the applicable probationary period would be five years. The Tennessee Supreme Court determined in 1975, however, that the 1966 amendment was invalid because of a failure to comply with certain procedural requirements. *Chapdelaine,* 532 S.W.2d at 546 n. 1; *State ex rel. Eads v. Humphries,* 562 S.W.2d 805, 806 (Tenn.1978).

The effect of the court's invalidation of the 1966 resolution was sharply limited by the court's holding that employment contracts negotiated at arm's length between university professors and state universities in reliance upon the 1966 resolution would nevertheless be enforced. *Eads,* 562 S.W.2d at 807. The probationary period for professors hired after 1966 would thus be five years if the relevant employment contract so provided. If the relevant employment contract provided for a three-year probationary period, that would be the period. *Chapdelaine,* 532 S.W.2d at 546.

Tenn.Code Ann. § 49–1421 was repealed in 1976 and replaced by Tenn.Code Ann. § 49–8–301. Subsection (c)(1) of the latter statute drastically changed the existing tenure system:

"Tenure shall only be acquired by a faculty member in an institution upon positive approval by the board, and no other type of tenure or right similar thereto shall be acquired by a faculty member."

The statute provided further that "present faculty in probationary employment shall be given credit for service in an institution toward completion of any new probationary period." § 49–8–301(c)(2). By explicitly prohibiting the acquisition of any type of tenure other than tenure "upon positive approval by the board," and by including "present faculty in probationary employment," the statute abolished, as of its effective date, the former system under which tenure rights were automatically acquired by operation of law.

The act provided that it was to "take effect on becoming a law." Act of March 18, 1976, § 6, 1976 Tenn.Pub. Acts 1274. The measure became a law when it was signed by the governor. See Tenn.Const. art. 2, § 18. The signing occurred on March 29, 1976.

The Tennessee Supreme Court's decisions in *Chapdelaine* and *Eads* held the parties to the probationary periods contained in the relevant employment contracts. In *Ford I,* we took essentially the same approach with respect to Mr. Ford's tenure rights, citing *Chapdelaine.* 741 F.2d at 864. Mrs. Ford's 1971–72 employment contract specified no probationary period whatever. It provided, rather, that

"This is a contract for the 1971–72 academic year only. Funds for this appointment are from an external source other than the official University budget and, therefore, there is no commitment expressed or implied that there be continuance beyond this contract.

Comments: *This contract for only the 1971–72 school year."

Mr. Knox's contract provided for a five-year probationary period, however, as did the contracts of every other new faculty member hired by the university's Department of Education in 1971 and 1972. There is no reason to suppose that Mrs. Ford's employment contract would not have contained precisely the same clause had she not been the victim of sex discrimination.

■ Under the old system of automatic tenure, Mrs. Ford would have become tenured upon completion of her fifth academic year in 1976 and reemployment for 1976–77. As we have noted, however, the system of automatic tenure was abolished on

March 29, 1976. That was before Mrs. Ford would have qualified for automatic tenure. The new system requiring "positive approval" by the Board of Regents would have taken effect before completion of Mrs. Ford's five-year probationary period.

It thus seems clear that Mrs. Ford would not have attained tenure automatically, and we are not prepared to say that the Board of Regents would have given its "positive approval" to tenure for her. For us to make that sort of assumption would entangle us in a matter "best left to academic professionals." *Gutzwiller*, 860 F.2d at 1333. We observed in *Gutzwiller* that such relief would be appropriate "only in the most exceptional cases ... [w]hen the court is convinced that a plaintiff reinstated to her former faculty position could not receive fair reconsideration ... of her tenure application." *Id.* We do not consider the case at bar one of these "most exceptional cases." Although the district court acted properly in ordering Mrs. Ford reinstated, we think it abused its discretion in ordering that her reinstatement be with tenure.

The judgment of the district court is AFFIRMED in part and REVERSED in part, and the case is REMANDED to the district court for further proceedings not inconsistent with this opinion.