STATE of Tennessee ex rel. Perry A.
CHAPDELAINE, Appellee,

v.

A. P. TORRENCE, President of Tennessee
State University, et al., Appellants.

Supreme Court of Tennessee.

Nov. 17, 1975.

On Petition to Rehear Jan. 19, 1976.

R. A. Ashley, Jr., Atty. Gen., Richard Lodge, Asst. Atty. Gen., Nashville, for appellants.

James D. Peterson, Peterson & Buerger, Franklin, Tenn., for appellee.

## OPINION

HENRY, Justice.

This civil action arises under the college and university teachers tenure law (§ 49–1421, et seq. T.C.A.), and presents principally the dual questions of a university professor's entitlement to tenure status and the remedies available for his wrongful dismissal. The Chancellor held that plaintiff was a tenurial teacher and awarded back pay, but declined to order reinstatement. All necessary and proper parties are before the Court.

### I.

As a threshold question we consider the defendants' insistence that a previous suit instituted in the United States District Court in the Middle District of Tennessee in the cause of *Perry A. Chapdelaine v. Dr. Sadie Gasaway, et al.,* is *res judicata* and operates to bar the present suit.

■ Chapdelaine filed his pro se complaint in District Court on 27 July 1971, against some of the parties involved in the instant suit. It is couched in lay language, sprinkled with a smattering of legalistic phraseology and represents a crude effort to simulate an action under Title 42 U.S.C. § 1983. The District Judge dismissed for failure to state a claim upon which relief can be granted. It contained no prayer for relief and did not, in any sense, raise the question presented by the present controversy.

The defense of *res judicata* is patently without merit.

### II.

Chapdelaine applied to Tennessee State University for a position as Assistant Professor of Mathematics. On 27 May 1966, he was notified by letter signed by the Dean of Faculty at Tennessee State that he was being recommended to the State Board of Education for employment effective 15 September 1966. The Dean advised:

The University offers the faculty certain fringe benefits such as: Teacher retirement, *tenure after three years of satisfactory service,* group life and hospital service, free admission to all university-sponsored cultural and athletic programs and social security benefits. (Emphasis supplied)

Chapdelaine relied upon this offer of employment and these representations, accepted the tendered position and received a letter from the Dean finalizing his employment.

He was re-employed for the next two school years and completed his three year

probationary period in June 1969, and was employed for the school year 1969–1970. The fact that his salary was increased each year attests to the satisfactory nature of his service. His reemployment for a fourth year, at an increased salary, affords affirmative and conclusive evidence that he had acquired tenurial status. This conclusion necessarily follows from the applicable statutory law, as supplemented by the regulations promulgated pursuant thereto.

## III.

Section 49–1421 T.C.A. reads as follows:

*College and university teachers under state board of education—Rules and regulations—Law applicable—Existing tenure teachers.*—The state board of education is hereby authorized and required to establish a system of tenure for college and university teachers under its jurisdiction. On or before September 1, 1961 the board shall promulgate and publish reasonable rules and regulations for the establishment of a tenure system for such teachers and the board shall have the power to promulgate and publish such rules and regulations as are deemed reasonably necessary for the establishment of such tenure system which shall include but not be limited to standards and requirements concerning, (a) the minimum qualifications of teachers eligible for tenure; (b) the types of tenure; (c) leaves of absence; (d) time of termination of tenure; (e) transfers within the system; (f) credit for time served in other school systems within the state; (g) grounds and procedures concerning suspensions and dismissals; (h) investigations; (i) suspensions pending investigations and (j) such other subjects as are deemed by the board to be reasonably related to teacher's tenure. The rules and regulations shall be adopted by a formal resolution by a majority of the membership, and the same shall be signed by a majority of the members of the state board of education as certified by the chairman and attested by the executive secretary of the board,

and otherwise they shall be approved and filed in the manner required by § 4–501, et seq., of this Code. After giving written notice of charges against any teacher, the board shall hold a hearing in the same manner and shall have the same powers as provided in § 49–1416, provided that where such section refers to the superintendent for the purpose of this chapter, reference shall be made to the chairman of the state board of education. In addition, a teacher shall be entitled to a judicial review of the action of the board for the same purposes and in the same manner provided by § 49–1417.

Provided that every college or university teacher, who, prior to March 16, 1961, has been recognized under policies, rules or regulations of the state board of education as having attained tenured status, shall, on and after March 16, 1961, be granted like tenure status by said board, provided that such college or university teacher has been employed by said board and has served for at least three (3) school years out of the last five (5) school years next preceding the school term which commenced in September, 1960, and has been reemployed by said board for the school year 1960–61, it being the legislative intent, and it is hereby so declared that such college or university teacher shall have, on and after March 16, 1961, like tenure status as such teacher had been granted under policies, rules or regulations of said board prior to such date; provided further that after such teacher has attained the tenure status authorized by the provisions of this paragraph, such teacher, thereafter, shall be subject to the provisions of the first paragraph of this section as well as to the provisions of all other sections of §§ 49–1421, 49–1422.

The second paragraph of the above quoted statute evidences a legislative intent that college and university teachers who had already acquired tenure status would continue that status if (1) they had served

three out of the last five years and (2) had been reemployed for the ensuing year. This comes close to being a legislative determination that the probationary period should be three years; however, the legislature required the state board of education to establish a system of tenure for college and university teachers.

Responsive to this mandate the State Board of Education, on 11 August 1961, adopted an appropriate regulation, which contains the following provision:

Teachers shall be employed for the academic year annually during a probationary period of *three years* after which time if their services have been satisfactory, they may become members of the permanent teaching staff. The probationary period may be extended or shortened upon recommendation of the president of the college subject to the approval of the State Board of Education. (Emphasis supplied)

█ This regulation was approved by the Attorney General and filed with the Secretary of State, pursuant to the positive provisions of § 4–501 T.C.A., and remained in effect at all times relevant to this controversy.[1]

The record reflects an evident misunderstanding on the part of the President of Tennessee State University (apparently shared by the State Board of Education) of the length of the probationary period. The affidavit of the President appears in the technical record. Under oath, Dr. Torrence stated:

At all times during Mr. Chapdelaine's employment, the achievement of tenure at Tennessee State University was *not marked by an affirmative action* on the part of either the University, the Board, or the employee; tenure was and is *automatically acquired* by those who meet the requirements of the law and the relevant regulations of the Board. At all times during Chapdelaine's employment, tenure could only be acquired by a full-time employee who served for *five* consecutive school years and who was rehired at the end of this probationary period. (Emphasis supplied)

We are in total agreement with Dr. Torrence that tenure was automatic upon the completion of a probationary period coupled with reemployment. But the probationary period was *three* years as opposed to *five*, a fact that apparently was not known to Dr. Torrence even after the institution of this lawsuit.

Under the statutory law as implemented by the 1961 regulation, college teachers acquired tenure automatically at the conclusion of the probationary period if their service was satisfactory, or, phrasing it another way, if they were rehired for the ensuing year.

College presidents and the state board of education had three choices in respect to tenure, viz:

a. they could re-hire a satisfactory teacher and thus confer tenure as they did in this case.

b. they could extend the period of probation, with appropriate notice to the teacher, and rehire for a further period of probation.

c. they could shorten the probationary period and confer tenure.

Dr. Torrence, in testimony subsequent to his affidavit, and presumably after he learned that the three-year rule was still in effect, altered his position. He insisted that tenure status could only be attained pursuant to a recommendation by the President and approval of the State Board of

---

1. The record reflects that the State Board of Education adopted a resolution on 11 February 1966 changing the probationary period from three to five years; however, this regulation was not approved by the Attorney General and was not filed with the Secretary of State. These are conditions precedent to the effectiveness of such rule or regulation, under § 4–502, T.C.A., and the failure to comply with them rendered the changes inoperative and ineffective and continued the 1961 regulation in force.

Education. It is evident that this has been the belief, the practice and the policy of the State Board of Education, and this is the basic insistence of the parties defendant on this appeal.

■ But this does not accord with the regulations filed pursuant to the tenure statute (49–1421) in 1961. This erroneous construction of the law by the State Board of Education cannot operate to confer any legal right or to deprive a college teacher of a status to which he is entitled under the law. The rule that administrative construction of statutes by officers charged with the duty of their enforcement, over a long period of time, is entitled to great consideration by the courts is not applicable to erroneous constructions of unambiguous statutes. *Sanford Realty Company v. City of Knoxville*, 172 Tenn. 125, 110 S.W.2d 325 (1937). Moreover, courts are not bound by the construction placed upon statutes by officers charged with their enforcement. *Pryor v. Marion County*, 140 Tenn. 399, 204 S.W. 1152 (1917).

Defendants insist before this Court that we should note the "evolving common law of tenure in Tennessee" and cite us to the practice and procedure whereunder tenure is granted only upon the recommendation of the College President and upon the approval of the State Board of Education (now State Board of Regents). This practice which was pursued without sanction of the law, and more particularly in derogation of the policy publicly proclaimed in the 1961 regulation, which has the full force and effect of law, cannot form a valid basis for the establishment of a "common law" of tenure. The State Board of Education is simply hoist on its own petard.

■ In this particular case there is an additional consideration in Chapdelaine's favor. He accepted appointment in reliance upon the affirmative representation that among the fringe benefits offered by the University was tenure *after three years of satisfactory service.* This created a viable understanding that satisfactory service for three years would result in tenure status. A college can create a contractual relationship, independent of tenure laws, which would result in tenure. Courts may apply the conventional standards of transactions in the market place to any agreement reached by the unqualified acceptance of an unqualified offer.

■ We hold that under the college teacher's tenure act and by virtue of special contract, Chapdelaine acquired tenurial status upon the completion of three years of satisfactory probational service. Thereafter, he was entitled to all the rights and privileges inhering in this status.

IV.

Among the rights specifically given to tenure teachers under § 49–1421 T.C.A. is the right to receive written notice of charges. Chapdelaine was terminated without such notice. We now review the events leading up to his termination.

On 24 June 1969, he addressed a letter to the head of the Department of Physics and Mathematics, enclosing a copy of the letter of 27 May 1966 from the Dean offering employment and advising of his entitlement to tenure after three years, and making inquiry as to the necessity to "fill out some kind of form requesting that tenure be granted". He was advised that "there is no item on the form which the teaching staff is expected to execute", and that "recommendations for tenure status are made at a designated time of year".

On 23 August 1969, the Dean of the School of Arts and Sciences addressed a further reply to Chapdelaine advising:

Recently the Board of Education ruled that a teacher could receive tenure after *five* years of satisfactory service. (Emphasis supplied)

This was Chapdelaine's first notice that the tenure representation made by Dean Jackson would be breached.

It should be noted that Chapdelaine had been assigned to direct a Computer Assisted Instruction Program conducted at Tennessee State University and sponsored and funded by the National Science Foundation. For reasons and under circumstances not here appropriate for discussion, the Foundation withdrew its funding effective 30 September 1970. On 18 August 1970, Dr. Torrence advised Chapdelaine that his service would terminate on 30 September 1970. Significantly, Dr. Torrence closed his letter by advising that "we appreciate very much the services you have rendered the University". Also of significance is the fact that much of this letter is devoted to the matter of obtaining other employment for Chapdelaine.

On 8 September 1970 Chapdelaine made a written "formal request for a hearing before the Tennessee State Board of Education on the dismissal action taken against me in your letter of August 18, 1970."

An informal conference was held on 15 September 1970 in Dr. Torrence's office, attended by Chapdelaine and others. The next day, 16 September 1970, Dr. Torrence addressed a letter to Chapdelaine advising of an employment arrangement whereby he would be employed for the school year 1970–71, jointly by the University of Tennessee, Nashville Center and Tennessee State University,[2] at a salary of $10,000. Chapdelaine accepted the offer of employment and withdrew his demand for a hearing.

On 11 March 1971 the Chancellor of the University of Tennessee, Nashville Center and Dr. Torrence addressed letters to Chapdelaine advising that he would not be employed full time for the academic year 1971–72. The Chancellor felt it was necessary to "employ a math instructor with a terminal (jargon for Ph.D.) degree", but significantly he offered part-time employment. Dr. Torrence offered part-time employment conditioned upon teaching demands and budgetary justification.

At this point, on 11 March 1971, therefore, the record shows that Chapdelaine's services had been satisfactory. In no sense did these letters constitute charges as required by § 49–1421 T.C.A., and yet, in order to invoke the appropriate provisions of the law they must be so treated. Otherwise, Chapdelaine had no statutory remedy.

V.

Section 49–1421 T.C.A. requires that after written notice of charges are filed, the board of education must hold a hearing in the manner provided in § 49–1416 T.C.A. with the provision that where this section refers to the "superintendent" it shall be treated, in this regard, as referring to the chairman of the state board of education. Reading it as thus modified, § 49–1416, as it existed at that time, required that the chairman of the State Board of Education schedule a hearing on the charges. The statute contemplates a full evidentiary hearing of an adversary nature.

By letter dated 5 April 1971, Dr. E. C. Stimbert, Commissioner of Education and *ex officio* chairman of the State Board of Education, acknowledged the receipt of the request for a hearing and suggested an informal conference on 14 April 1971, in his office. This conference was held and by letter dated 23 April 1971, Commissioner Stimbert advised Chapdelaine as follows:

After reviewing the matter of your employment at Tennessee State University, I have concluded that there is no evidence of undue prejudice against you; and I, therefore, support the administrative decision made by the president.

It is regrettable that you were misinformed about the acquisition of tenure; but, nevertheless, university officials are without power to alter regulations established by the State Board of Education

---

**2.** These are state institutions. Tennessee State University functions under the supervision of the Board of Regents. The University of Tennessee, Nashville Center, is under the supervision of the Board of Trustees of the University of Tennessee.

prior to your employment. There being no grounds for granting a hearing before the State Board of Education, your request is denied.

It is evident that Dr. Stimbert was relying upon the 1966 abortive effort to change the probationary period from three to five years.

■ It is also evident that the denial of the demanded hearing frustrated the law and deprived Chapdelaine of constitutional due process.

This suit was instituted on 1 September 1972, approximately seventeen months after the final action taken by the Commissioner of Education (Chairman of the Board).

■ Defendants vigorously insist that this action is barred by the provisions of § 49–1417 T.C.A. This section, made applicable by § 49–1421, provides for judicial review by petition filed in the Chancery Court "within thirty (30) days from the receipt by the teacher of notice of the decision of the board".

The State Board of Education did not act, according to the record; it reached no decision. The action taken was that of the chairman alone and does not purport to be the action of the Board. Obviously plaintiff may not be denied a hearing by individual action of the Board and then have his suit abated by individual action of the chairman, for failure to appeal from a nonexistent Board decision. Such a procedure completely frustrates fairness and makes a mockery of constitutional due process. Had the Board acted—even without a hearing—we would have reached a contrary conclusion.

■ We are not willing to hold, under all the facts and circumstances of this case, that plaintiff was guilty of laches in the prosecution of his suit.

We limit this holding however to those cases wherein the hearing contemplated by § 49–1416 is denied or where a teacher is terminated without the preferment of written charges. In such cases, the delay in the institution of the suit does not constitute a bar to the action but is a factor weighing very heavily upon the back pay to be awarded the dismissed teachers.

In holding that Chapdelaine was wrongfully discharged, we are not unmindful of the fact that budgetary limitations forced a decrease in personnel.

■ When any educational institution is required, for any reason, to reduce its teaching force, a decent regard for the spirit and purpose of the tenure laws and for fundamental fairness demands that non-tenured teachers be first dismissed followed by tenure teachers in the order of their seniority, with due regard being given to certifications and other controlling considerations. There is no proof in the record indicating that this procedure was followed. In fact, there is a strong suggestion to the contrary. The burden was on defendants to show that their actions were fair and conformed to the tone and tenor of the tenure laws. They did not meet that burden.

## VI.

We next consider the Chancellor's award of the sum of $12,500.00.

While the Chancellor treated this as "damages", we think that is an unfortunate characterization. The word "damages" connotes a recovery for hurt, harm or injury inflicted upon an injured party. We are not dealing here with damages in the conventional sense of the word. The award was simply an enforced restitution of unpaid wages to the extent they were not mitigated. In common parlance this was an award for back pay.

■ We embark on this discussion with certain fixed principles of law by which we must be guided. At the outset we recognize that our review of the Chancellor's decree is *de novo*, accompanied by a presumption of the correctness, unless the evi-

dence preponderates against the findings upon which the decree is based. *Potts v. Gibson*, 225 Tenn. 321, 469 S.W.2d 130 (1971).

Secondly, the measure of damages for the breach of an employment contract is what would have come to plaintiff had the contract not been breached, less what he earned, or might have earned, in some other employment, by the exercise of reasonable diligence. *Godson v. MacFadden*, 162 Tenn. 528, 39 S.W.2d 287 (1931).

The burden is on the defendants who breached the contract to prove what amounts should be offset in mitigation of damages. *Glazer v. Glazer*, 278 F.Supp. 476 (E.D.La.1968); *Rolfe v. County Board of Education*, 391 F.2d 77 (6th Cir. 1968); *Jeffers v. Stanley*, 486 S.W.2d 737 (Tenn.1972).

We note the Chancellor's findings: The proof shows that since his discharge the petitioner has (1) written science fiction, (2) learned the surveyor's trade, (3) helped in a family business and (4) attempted various publishing endeavors. The proof shows a minimal return from these projects but the Court is not convinced that the results of these endeavors have no value. The petitioner elected to proceed in these projects which might in the long run prove more valuable than his position with the University.

Ample, material evidence supports these findings and the conclusion that an award of one year's salary was fair and just.

We concur in the holding of the Chancellor that this is not a proper case for reinstatement although we do not precisely agree with his reasoning.

### VII.

We are not impressed with the insistence that this action against these defendants, as state officials engaged in the pursuit of their official duties, is a suit against the state and, therefore, is barred by sovereign immunity.

Article 1, Section 17 of the Constitution of Tennessee provides in pertinent part:

*Suits may be brought against the State* in such manner and in such courts as the Legislature may by law direct. (Emphasis supplied).

Section 49–1417 T.C.A. gives the Chancery Court jurisdiction of actions brought by tenured teachers to review their dismissal.

Cities and counties are arms of the state and such immunity as they claim is wholly derivative from the state itself, and this Court has consistently approved awards of back pay as to teachers in city and county school systems. See e. g., *Jeffers v. Stanley, supra; Wagner v. Elizabethton City Board of Education*, 496 S.W.2d 468 (Tenn. 1973).

### VIII.

The State contends that mandamus is not a proper remedy in a case such as this but concedes that a mandatory injunction will lie. In part the State asserts in its brief that "traditionally a mandatory injunction and a writ of mandamus have been used almost interchangeably", citing *Condon v. Maloney*, 108 Tenn. 82, 65 S.W. 871 (1901).

Under Tennessee law a suit for mandamus is an appropriate remedy under the Teachers' Tenure Act. *Blair v. Mayo*, 224 Tenn. 108, 450 S.W.2d 582 (1969).

On remand, the peremptory writ of mandamus will accordingly issue directing the Board of Regents of the State of Tennessee to pay to the petitioner the sum of $12,-500.00 plus interest since November 26, 1973.

The decree of the Chancellor is

Affirmed and remanded.

FONES, C. J., and COOPER, BROCK and HARBISON, JJ., concur.

## OPINION ON PETITIONS TO REHEAR

Both parties have filed petitions to rehear.

Chapdelaine's petition contains an elaborate discussion of his constitutional right of due process and complains primarily of the fact that he did not receive written charges or notice of dismissal and was not afforded an adversary confrontation. We agree. And we so held. It was because of these procedural irregularities that we permitted the Chancery Court's award of back pay to stand.

Upon reconsideration, we continue to be of the opinion that this is not a proper case for reinstatement.

The State's petition insists that we failed to consider § 20–1702 T.C.A. relating to the sovereign immunity of the State. Section VII of the main opinion discusses this issue. We reiterate that "we are not impressed with the insistence (that this) is a suit against the State and, therefore, is barred by sovereign immunity."

The college and university teachers' tenure law, as incorporated in § 49–1421 T.C.A., and the regulations promulgated pursuant thereto, would be "as sounding brass, or a tinkling cymbal", if it did not carry with it the coordinate right of a tenured teacher to seek back pay in wrongful dismissal cases.

The State hyperbolizes horrendous happenings as the inevitable result of the Court's ruling. A fair example, taken from its brief:

> It is estimated that at Memphis State University alone the Court has committed *in excess of $10,000,000.00* for the lifetime payment of *mediocre in-instruction.* (Emphasis supplied)

We are astounded at this allegation—so astounded that we decline to treat it as an admission. If it be true, the situation at Memphis State is in urgent need of immediate remedial action.

If the teachers' tenure laws have tended to promote mediocrity, the fault must lie with the school administrators and their failure to take appropriate affirmative action to weed out the mediocre and the misfits. When they do not have the courage to terminate mediocre teachers prior to their attainment of tenure status, they have no standing to criticize the courts for the enforcement of the laws. The law permits colleges and universities to lengthen the probationary period—in fact it may be prolonged indefinitely. If they have sat idly by and galvanized incompetents into permanent fixtures, they have only themselves to blame. The Legislature gave them a sound and workable law. When the skipper of a ship ignores his compass and winds up on the reefs and rocks, he is not in a position to point the finger of blame at those who observe and assess the consequences. Hopefully, this opinion will result in many houses being placed in order.

██ This opinion, however, does not mean that *all* college and university professors attained tenure after three years of satisfactory service coupled with re-employment. Those teachers with actual notice of the five-year rule, or whose contracts contained apt five-year provisions or references, are not affected by this holding. Chapdelaine was employed with the understanding that he would attain tenure status at the end of three years and the 1961 regulation so provided.

The petitions to rehear are respectfully denied.

All concur.