**FEN HIN CHON ENTERPRISES, LTD.,
Plaintiff–Appellant (87–6277),
Plaintiff–Appellee (87–6303),**

v.

**PORELON, INC., Defendant–Appellee
(87–6277), Defendant–Appellant
(87–6303).**

**Nos. 87–6277, 87–6303.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 14, 1988.

Decided May 15, 1989.

Rehearing Denied June 27, 1989.

Jon E. Jones, Moore, Jones, Rader and Clift, Daniel H. Rader, III (argued), Cookeville, Tenn., for Fen Hin Chon Enterprises, Ltd.

Eugene Jared, Madewell and Jared, Cookeville, Tenn., Robert L. Binder (argued), Foley & Lardner, Milwaukee, Wis., James T. McKeown, for Porelon, Inc.

Before NELSON and BOGGS, Circuit Judges, and ENSLEN, District Judge.[*]

DAVID A. NELSON, Circuit Judge.

This is a breach of contract case, governed by Tennessee law, in which we are asked to review the method by which the district court calculated damages. Measurement of the damages in question requires a determination of profits lost in one of the plaintiff's two major lines of business. The main questions to be decided are whether the district court ought to have calculated lost profits on the basis of the profit rate for the consolidated business, as opposed to the profit rate for the individual business that was actually affected by the breach, and whether a projected marginal cost approach, as opposed to a fully allocated historic cost approach, ought to have been employed in estimating lost profits.

The plaintiff, Fen Hin Chon Enterprises (FHC), manufactured and sold self-inking rubber stamps as the licensee, in Hong Kong and Macao, of defendant Porelon's trademarks and manufacturing know-how. The district court, sitting without a jury, found that FHC suffered a two-year diminution in sales because of a breach of Porelon's contractual obligations late in 1982 and early in 1983. The court also found that there was a wrongful termination of the licenses in 1986, as a result of which

---

[*] The Honorable Richard D. Enslen, United States District Judge for the Western District of Michigan, sitting by designation.

FHC went out of the rubber stamp business altogether. The district court's rulings on liability are not challenged here, but each party takes issue with at least one aspect of the court's calculation of damages.

In addition to its stamp business, FHC operated an unrelated "export-import" business involving the issuance of letters of credit, for a commission, in connection with international sales of merchandise. The performance of the individual businesses was accounted for separately in unaudited profit and loss statements prepared on a cash receipts basis. The audited financial statements for the corporation as a whole—which statements did not allocate earnings to the constituent businesses— were prepared on an accrual basis. Although the separate profit and loss statements indicated that the stamp business was far more profitable than the export-import business, defendant Porelon contends here, as it did in the district court, that damages ought to be computed on the basis of the average historic profit margin for the entire corporation, without reference to the profit margin reflected in the separate books of the stamp business. The district court rejected this contention; we think the court was correct in doing so.

The district court calculated profits on the basis of the average unit cost of the stamps actually manufactured and sold, instead of using the lower marginal costs of the additional units that would have been manufactured and sold but for the defendant's breach of contract. The plaintiff has taken a cross-appeal on this issue. We shall remand the case for a recalculation of damages under a marginal cost approach, because we think such an approach would result in a better approximation of the results that would have been achieved if Porelon had honored its contractual commitments. In all other respects the judgment of the district court will be affirmed.

I

Porelon, an affiliate of Johnson Wax, is a leading manufacturer of ink-impregnated plastic resins. These resins, in the form of a "pre-mix," are sold to licensees for use in the manufacture of pre-inked rubber stamps. On November 15, 1974, Porelon and FHC entered into an agreement under which FHC was granted a nonexclusive license to use Porelon's stamp manufacturing know-how, plus an exclusive license to use the trademarks "Porelon" and "Perma–Stamp" within a territory limited initially to Hong Kong. The agreement was subsequently amended to expand the territory and to extend the duration of the licenses through 1984. In 1980, a clause permitting termination of the agreement on 60 days' notice by either party was replaced by a new termination clause allowing termination only upon default or breach of the contract. On January 1, 1983, the parties entered into a new agreement, superseding all previous agreements; the new agreement granted FHC exclusive use of Porelon's know-how and trademarks in Hong Kong and Macao through December 31, 1989.

FHC's first breach of contract claim was based largely on the activities, during late 1982 and early 1983, of a man named Wil Ooms. Mr. Ooms was a Johnson Wax marketing executive assigned to Porelon by its corporate parent, Johnson Worldwide Associates. Notwithstanding Porelon's grant of an exclusive license to FHC, Ooms secretly undertook to help Mark Universal (MU), a rival Hong Kong stamp distributor, get a foothold in the manufacture of pre-inked stamps using Porelon technology and materials. Ooms attended one of MU's sales strategy meetings, sent it Porelon catalogs and zinc plates, assisted it in obtaining sample stamps, arranged for it to obtain 200 rubber stamps a day from a Singapore source, and otherwise helped it establish a rubber stamp production capability in Hong Kong. Ooms also stood idly by as MU falsely advertised that MU was the exclusive licensed agent for the distribution of the "Perma–Stamp" product line in Hong Kong, turning a deaf ear to FHC's request that Porelon demand a retraction. FHC's first breach of contract claim sought damages for profits lost on sales diverted to MU as a result of Ooms' misconduct.

The second breach of contract claim was based on Porelon's termination of the 1983 license agreement. Porelon formally terminated the contract on August 20, 1986, and FHC's production came to a halt in November of 1986. The damages sought on account of the termination were lost profits from December of 1986 through the scheduled expiration of the contract in December of 1989.

On December 1, 1986, FHC sold all of the equipment, inventory, and supplies in its stamp business to Evernice Investment, Ltd., a corporation owned by individuals some of whom were also owners of FHC. The price was determined by an independent appraisal. Evernice has continued to manufacture and sell stamps in Hong Kong using pre-mix obtained from sources other than Porelon.

FHC filed a diversity action against Porelon, Ooms, and Mark Universal for breach of contract and inducement of breach of contract. The claims against Mark Universal and Ooms were dropped before trial. After a two-week bench trial, the district court found in favor of FHC on the liability issue and awarded damages of $575,000.

In calculating damages resulting from Ooms' interference with FHC's business, the court took the estimated sales loss over a two-year period, multiplied it by a factor of .2284—the "average actual historical profit margin" reflected in the annual profit and loss statements of the stamp business—and added an interest component of 6.5 percent, the sales loss having already occurred. In calculating damages resulting from the wrongful termination of the contract in 1986, the court took 22.84 percent of the stamp sales projected for December of 1986 through 1989 and discounted the future sales component in that figure to present value at a rate of 6.5 percent. The district court considered and rejected various arguments that FHC had not mitigated its damages. *Fen Hin Chon Enterprises, Ltd. v. Porelon, Inc.,* 667 F.Supp. 1174 (M.D.Tenn.1987).

Porelon filed a motion to alter or amend the judgment in several respects. The district court denied the motion, explaining its reasons in an unpublished supplemental opinion. This appeal followed.

## II

Porelon does not here challenge the district court's findings on the breach of contract questions, nor does it question the district court's determinations as to the volume of sales lost in 1983–84 and in the period from December 1986 through 1989. Porelon argues vigorously, however, that the profit margin applied to the lost sales ought to have been 10.95 percent, which is the average rate reflected in the annual financial statements for FHC's combined operations, including both the stamp business and the export-import business, for years other than 1983–84. Porelon also argues that the district court awarded damages for conduct that the court had already held not to be in violation of the contract; that the sale of the stamp business to Evernice was a sham; that FHC's sale of the stamp business amounted to a failure to mitigate its damages; that the damage award ought to have been reduced by the amount of a severance pay liability that FHC avoided through the sale to Evernice and by the amount of a 5 percent royalty received by FHC after the sale; and that the district court ought to have ordered Porelon to sell pre-mix to FHC rather than awarding damages.

FHC, for its part, contends that the damages it suffered in 1983–84, while it was still in the stamp business, ought to have been calculated by taking the lost sales, as determined by the district court, and deducting the variable costs associated with those sales. The marginal profit rate on the lost sales, as determined under this approach, would have been 28.25 percent, according to FHC—a rate significantly higher than the 22.84 percent average historic rate of profit used by the court.

If FHC's conceptual approach is accepted, consistency would seem to require an adjustment in the damages awarded for the wrongful termination of the contract in 1986. If the unit cost of manufacturing and selling the relatively large quantity of

stamps projected to be sold in 1986–89 would have been lower than the unit cost of manufacturing and selling the smaller quantity sold historically, the logic of FHC's approach—an approach with which we are basically in agreement—suggests that the lower unit costs ought to be used in determining what profits FHC would have achieved if the contract had not been prematurely canceled.

## III

■ Given the sharply divergent characteristics of FHC's two separate lines of business, it would be quite surprising if the businesses happened to be equally profitable year after year. We have found nothing in the record to suggest that they were equally profitable, and much to suggest that they were not. There is thus no reason to suppose that the rate of profit earned by the consolidated business during any particular time frame would be likely to match the rate of profit for either the stamp business alone or the export-import business alone.

Dr. Edison Tse, the son of one of FHC's principals and himself a part-owner of FHC, testified that for a long time the export-import operation represented 100 percent of FHC's business. In explaining how the export-import business functioned, Dr. Tse testified that if a company in Indonesia, for example, wanted to buy motorcycles from a company in Japan, FHC would issue a line of credit to assure payment for the goods and would charge the Indonesian buyer a 3 percent commission. FHC could easily make millions of dollars a year by issuing letters of credit on large purchases, Dr. Tse said, but the risks could be high; as a guarantor, FHC would incur a big loss if a buyer failed to pay the seller and FHC had to make good the default. Dr. Tse testified, without contradiction, that FHC's export-import business had been "very highly volatile" over the years. Dr. Tse noted that the export-import business made a lot of money in 1986, for example, but it experienced net losses, in widely varying amounts, for several years earlier.

Dr. Tse encouraged his father to "try to get into something a little bit more stable," and the stamp business fit that description. In 1974 Johnson Wax contacted Dr. Tse about establishing a market in Hong Kong for the company's newly developed pre-inked hand stamps, and Dr. Tse got his father's company to open a factory to make the new product. The demand for conventional rubber stamps was high, but pre-inked stamps were unknown in Hong Kong at that time. After a difficult start, which was complicated by the fact that pre-inked stamps cost more than the conventional variety and initially took much longer to produce, FHC began rapidly to increase its sales of the new type of stamp.

In 1978, FHC's stamp sales came to HK $514,617; the corresponding figure for 1985 was HK $3,909,947. (The parties stipulated to an exchange rate of 7.8 Hong Kong dollars to one U.S. dollar.) FHC's contemporaneously maintained profit and loss statements showed that the stamp business was profitable throughout this period, with profit margins reaching almost 30 percent in the 1980s except for a three-year period beginning in 1983, the first year to be affected by Porelon's breach of contract. The rate of profit dropped to 8.6 percent in 1984, but was back up to 29.5 percent for the first 11 months of 1986.

Notwithstanding that the profit and loss statements for the stamp business were prepared in the normal course of FHC's business and were subject to audit by Porelon under the license agreements, Porelon now contends that the records of the stamp business drastically overstated the profitability of that operation by omitting shared costs a portion of which ought to have been assigned to the stamp business and all of which were assigned to the export-import business instead. Porelon tells us that it is "totally implausible" that the Tse family would have continued to operate its original export-import business had that business in fact been losing substantial sums of money for several years, and we are asked to assume that the profit margin reflected in the financial reports of the consolidated business (export-import-*cum*-stamps) is

more representative of the performance of the stamp business alone than is the profit margin reflected in the books of the stamp business itself.

Like the district court, we are unwilling to make such an assumption. The notion that sophisticated business people always bail out of any line of business that loses money for several years is patently wrong where the United States is concerned, as any reader of America's financial press can attest, and we have been given no reason to suppose that people who operate privately-held corporations in Hong Kong are less willing than their American counterparts to absorb a string of losses in the hope of achieving an eventual turn-around. Hope does sometimes triumph over experience, as Dr. Johnson once observed in another context, and we might add that experience sometimes inspires a measure of hope that appears, in hindsight, to have been misplaced.

The district court did find that certain expense items which FHC's bookkeepers had allocated solely to the export-import business ought to have been apportioned between the export-import business and the stamp business. (As the court noted in its supplemental opinion, there was also testimony that certain salary expenses which had been assigned solely to the stamp business benefitted the export-import business as well.) In its published opinion, the court said that the misallocation of expenses—characterized at one point as "manipulative"—made the profit projections for the stamp business "somewhat flawed." 667 F.Supp. at 1186. In its supplemental opinion, however, the court found that only five comparatively minor expense items which had been charged exclusively to the export-import business ought to have been apportioned between the two businesses. (These items consisted of advertising, postage and telex, entertainment, travel, and audit fees.) "The court does not find any fault with allocations dealing with any other

item," the supplemental opinion declared, and Porelon's brief on appeal concedes that "the court apparently abandoned its prior holding that the [export-import] business losses and the stamp business profits were 'exaggerated at best, reflecting manipulative accounting procedures.'"

In 1982, the last year before FHC's profits were affected by Porelon's breach of contract, the stamp business enjoyed sales of HK $2,735,746. The costs incurred by FHC in 1982 for advertising, postage and telex, entertainment, travel, and audit fees came to HK $274,421. If 100 percent of these shared costs had been reallocated to the stamp business—and nothing in the district court's opinion suggests that a reallocation of that magnitude would be appropriate—the profits in the stamp business would have come to HK $540,224, and the rate of profit in the stamp business would have been almost 20 percent.[1] The rate of profit reflected in the financial statements of the consolidated business for 1982, by contrast, came to less than 11 percent—roughly half of the reduced profit margin for the stamp business alone. Discrepancies between cash accounting and accrual accounting might explain a minor portion of this wide spread in profit rates, but nothing more than that—and over a period of years, the results of the two methods of accounting would tend to converge in any event. Against this background, we can see no justification for assuming that the rate of profit on stamp sales lost as a result of Porelon's misconduct would have corresponded to the average rate of profit experienced by the export-import and stamp businesses combined. Porelon's arguments on this point are totally unpersuasive.

## IV

◼ Although we agree with the district court's conclusion that the profits lost by FHC as a result of Porelon's breaches of

---

1. Higher profit margins could be anticipated in subsequent years, as sales increased, assuming fixed costs remained relatively constant. The district court noted that "[t]he profit margin would have increased with sales volume since fixed costs are absorbed at a certain level and beyond that point only variable costs are relevant in calculating profit." 667 F.Supp. at 1186 n. 24.

contract cannot be measured by the profit margins experienced in the consolidated business, the court's use of a 22.84 percent rate of profit is troublesome. On the one hand, that rate—which constitutes the average profit reflected in the profit and loss statements of the stamp business for 1978 through November of 1986–has not been adjusted to compensate for the fact that advertising and other costs allocated solely to the export-import business ought to have been apportioned between FHC's two separate businesses. On the other hand, the 22.84 percent rate fails to reflect the apparently indisputable fact that the unit costs actually incurred by FHC in its stamp business were substantially higher than the unit costs that would have been incurred had there been no breach of contract by Porelon. It would be purely fortuitous if these conflicting factors canceled each other out exactly, and our preliminary analysis suggests that the 22.84 percent rate is, in fact, unduly favorable to Porelon.

In 1983, for example, when FHC first felt the effects of Porelon's breach, FHC's actual stamp sales came to HK $2,777,400. The district court found—and neither party here disputes the finding—that but for the breach of contract, 1983 stamp sales would have been HK $3,744,426. Wages and overhead costs would have remained the same, according to the unchallenged testimony of Dr. Tse, so the marginal profit on the lost HK $967,026 would have been substantially higher than the profit realized on the stamps actually sold.

The costs of advertising, postage and telex, entertainment, travel, and audit came to HK $368,047 in 1983. If one were to reallocate 100 percent of those costs to the stamp business, while increasing material costs, royalties, and other direct costs by 34.82 percent—the percentage by which the projected stamp sales of HK $3,744,426 exceed the actual stamp sales of HK $2,777,400—the loss of profit in the stamp business in 1983, as we calculate it, would be something like HK $327,874. This is about half again as much as the HK $220,-873 profit loss that the district court reached by using the 22.84 percent profit rate.

Conceptually, we believe, the variable cost approach we have tried to sketch out in the preceding paragraphs is the approach best calculated to make FHC whole —to put the company, as nearly as possible, in the position it would have occupied if there had not been any breach of contract. And that, under Tennessee law, is what damages for breach of contract are all about. See *Allen v. Elliott Reynolds Motor Co.*, 33 Tenn.App. 179, 230 S.W.2d 418, 424 (1950); *Action Ads, Inc. v. William B. Tanner Co.*, 592 S.W.2d 572, 575 (Tenn.Ct. App.1979). Tennessee courts have long applied this rule in lost profits cases, allowing a plaintiff to recover the profits he would have earned had the contract been performed. *Whorley v. Tennessee Centennial Exposition Co.*, 62 S.W. 346 (Tenn.Ch. App.1901); *Chisholm & Moore Mfg. Co. v. United States Canopy Co.*, 111 Tenn. 202, 77 S.W. 1062 (1903); *American Buildings Co. v. DBH Attachments, Inc.*, 676 S.W.2d 558, 562 (Tenn.Ct.App.1984).

The district court acknowledged, in its supplemental opinion, that it could have adopted the variable cost theory, but the court declined to do so because of uncertainties as to whether and how some of the costs assigned to the export-import business ought to be reallocated to the stamp business. We appreciate the problem, but we do not see how use of the stamp business's average historic rate of profit could solve the problem. To the extent that a misallocation of costs may have occurred, the misallocation is necessarily reflected in any historic profit rate derived from the profit and loss statements of the stamp business. Standing alone, the misallocation may have benefitted FHC; but any such benefit would appear to be dwarfed by the unfair penalty visited upon FHC when profits on the lost sales are determined on the basis of historic average costs that would not have been incurred in connection with those particular sales, rather than on the basis of variable costs that would actually have been incurred.

We recognize that the district court will not be able to make an absolutely accurate reallocation of costs. Where perfection is

impossible, it is not required—and on the record before us, it seems clear that any reasonable reallocation of costs, coupled with the use of a marginal profit approach, will produce a fairer result than that reached under the historic cost methodology. On remand, therefore, the court should exercise its best judgment as to both the reallocation of salary expense from the stamp business to the export-import business and the reallocation of audit expenses and the like from the export-import business to the stamp business. We are confident that the litigants' able counsel will have suggestions to offer on how such reallocations might be accomplished. The reallocations having been made, the district court should then determine the amount of lost profits, both for 1983–84 and 1986–89, by taking the projected sales that have already been determined and deducting the expenses that would actually have been incurred had those sales materialized.

### V

Porelon challenges several other aspects of the district court's calculation of damages, and we shall consider these arguments in turn.

### A

■ Porelon says first that the district court erroneously awarded damages for conduct that did not violate the parties' contract. FHC contended that Porelon's conduct in 1982–83 violated the parties' contract in three ways: (1) by furnishing critical know-how to FHC's competitor MU at a time when FHC held an exclusive license for the use of Porelon's trademarks in Hong Kong; (2) by arranging for MU to obtain a supply of stamps from Porelon's Singapore licensee; and (3) by violating the implied covenant of good faith and fair dealing inherent in every contract. The district court found that the furnishing of know-how to one of FHC's competitors did not violate the contract, since FHC held only a nonexclusive license to use Porelon's know-how. The court found that FHC's actions in arranging for FHC's competitor

to obtain supplies from Singapore did violate the contract. The district court did not explicitly address the third branch of the breach of contract claim, the asserted breach of the implied covenant of good faith and fair dealing inherent in every contract. Porelon argues that the district court's damage award for the 1982–83 breach far exceeds any damages that could have resulted from FHC's arrangements to supply MU through its Singapore licensee, and the damage award must therefore have been based, in part, on Porelon's furnishing of know-how to MU.

We disagree. During this period, Porelon representative Wil Ooms met secretly with MU to help it map out a strategy for competing with FHC, Ooms tolerated false advertising by MU, and Ooms even countenanced an attempt by MU to bribe an FHC factory foreman to sabotage FHC's operations. Although the district court's opinion does not explicitly say so, it is clear from the record that the court's award of damages was based in part on Porelon's breach of its implied covenant of good faith and fair dealing. Accordingly, Porelon's argument that the district court awarded damages for conduct that did not violate the contract must be rejected.

### B

■ Porelon argues next that FHC's sale of the stamp business to Evernice was a sham, that Evernice must therefore be treated as the alter ego of FHC, and that FHC's damages should be reduced accordingly. Tennessee courts accept such arguments only in cases involving fraud, misrepresentation, or tortious conduct. See *Tennessee Racquetball Investors, Ltd. v. Bell*, 709 S.W.2d 617, 623 (Tenn.App.1986). Porelon cites various tort cases, *e.g., Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976), in which strong public policy concerns dictated holding a successor corporation liable for the torts of its predecessor. There is no general principle in corporate law requiring that a corporation that buys a factory from another corporation or hires its employees be treated as the seller corporation's alter ego.

FHC continues to exist as a corporation in its own right, and whatever Evernice may have done since it purchased FHC's hand stamp operations for good and sufficient consideration, we see no reason why it should affect FHC's recovery. The district court's factual finding that Evernice was not the alter ego of FHC is not clearly erroneous. We also note that there is no evidence in the record of Evernice's profits, and hence no reliable figure by which FHC's damages could be reduced.

To the extent that Porelon asks the court to pierce Evernice's corporate veil on the basis that certain corporate formalities have been ignored, we question whether Tennessee law can or should be applied to these Hong Kong corporations. Porelon has made no effort to show that the requirements of Hong Kong corporate law were not complied with here.

### C

■ Porelon argues that FHC ought to have mitigated its damages by continuing in the hand stamp business. Under this theory, the damage award ought to have been reduced by the amount FHC could have earned if it had stayed in the hand stamp business without Porelon's licenses.

As the district court opinion points out, FHC was charged only with acting reasonably:

> "The rule with respect to mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely to show that the injured party might have taken steps which seemed wiser or would have been more advantageous to the contract breaker."

667 F.Supp. at 1187 (quoting 9 Tenn.Juris. *Damages* § 19 (1983)). It is essential to view the situation as it appeared from FHC's perspective in December of 1986. FHC legitimately feared that the loss of the Perma–Stamp trademark would be disastrous for stamp sales, given its long-time "beware of substitutes" advertising campaign. FHC was also legitimately concerned about the availability of quality substitutes for the products it had previously obtained from Porelon. There was evidence at trial that there are technical problems with stamps using the lower quality pre-mix manufactured by Porelon's main competitor. Moreover, FHC's arch rival, Mark Universal, had obtained the exclusive right to use those products in Hong Kong, so FHC faced the prospect of being wholly dependent on bootlegged supplies. In light of this evidence, we see no clear error in the district court's resolution of this issue.

### D

■ Porelon finds fault with the district court's handling of the substantial severance pay liability to which FHC would have been subject under Hong Kong law if it had shut the stamp business down. Reserves for such severance pay are recorded as a liability on corporate books. When FHC sold its hand stamp operations to Evernice, Evernice assumed a severance pay obligation of $102,500. Porelon argues that being relieved of this liability was a benefit to FHC, and that FHC's damages ought to be reduced correspondingly.

We do not find this argument persuasive. Had Porelon forced FHC to shut its doors, FHC would have been obligated to pay the $102,500 in cash. Porelon would have been liable in damages to FHC for the amount of the cash severance payment, since the payment would have been a direct and proximate result of Porelon's breach. Instead, FHC arranged for the sale of its hand stamp operations as a going business on the condition that the purchaser assume the severance pay liability, thereby saving Porelon $102,500.

### E

■ Porelon next challenges the district court's failure to reduce FHC's damages by the amount of certain royalty payments FHC received. Under the contract of sale between FHC and Evernice, Evernice agreed to pay FHC a 5 percent royalty on the use of FHC's frog logo. FHC readily admits that "Porelon is theoretically correct" that "any monies received by FHC from Evernice's royalty for the use of the 'frog logo' should mitigate FHC's dam-

ages." Porelon elicited no evidence, however, of the amount FHC received under the royalty clause; Porelon simply asked the court to assume, without any basis in the record, that *every* stamp sold by Evernice would be subject to the royalty. In its supplemental opinion, the district court declined to "allow this item in mitigation because the court does not know whether Evernice sold one stamp or one thousand stamps bearing the frog stamp logo." The burden of proof on mitigation issues rests with the defendant, *State ex rel. Chapdelaine v. Torrence*, 532 S.W.2d 542, 550 (Tenn.1975), *cert. denied*, 425 U.S. 953, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976), and we do not believe the district court's resolution of this question was clearly erroneous.

Porelon argues, finally, that the district court erred in awarding FHC damages for breach of contract rather than issuing an injunction compelling specific performance of the contract. This argument is without merit; FHC had an adequate remedy at law, and the court was not required to compel Porelon to continue a business relationship that Porelon had chosen wrongfully to terminate.

The judgment of the district court is AFFIRMED in part and REVERSED in part, and the case is REMANDED for recalculation of damages.