# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

**FILED**

**March 9, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

STEVEN MEREDITH GARMON,           )
                                  )
          Plaintiff/Appellant,    )
                                  )    Appeal No.
                                  )    01-A-01-9803-CH-00132
VS.                               )
                                  )    Davidson Chancery
                                  )    No. 96-1749-I
                                  )
FISK UNIVERSITY,                  )
HENRY PONDER, PRESIDENT,          )
REAVIS L. MITCHELL, DEAN OF       )
ACADEMIC AFFAIRS,                 )
                                  )
          Defendants/Appellees.   )


APPEALED FROM THE CHANCERY COURT OF DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE IRVIN H. KILCREASE, JR., CHANCELLOR

KENT M. WEEKS
2021 Richard Jones Road, Suite 350
Nashville, Tennessee 37215
          Attorney for Plaintiff/Appellant

SUZETTE PEYTON
5317 Ashlawn Drive
Nashville, Tennessee 37211

RICHARD MANSON
1314 Fifth Avenue North, Suite 300
Nashville, Tennessee 37208
          Attorneys for Defendants/Appellees

AFFIRMED IN PART; REVERSED IN PART;
AND REMANDED


BEN H. CANTRELL
PRESIDING JUDGE, M.S.

CONCUR:
KOCH, J.
COTTRELL, J.

# O P I N I O N

A white college professor denied tenure sued his university employer for breach of contract and racial discrimination. The Chancery Court of Davidson County dismissed both claims. We reverse the judgment dismissing the contract claim and affirm the ruling on the discrimination claim.

## I.

Meredith Garmon, a graduate of the University of Virginia with a doctor's degree in philosophy, was employed by Fisk University on a four year tenure track in 1992. The university renewed his contract in 1993 and 1994 for the academic years that followed.

Tenure at Fisk is governed by the Faculty Handbook. In accordance with the handbook, the dean of academic affairs notified Dr. Garmon on October 18, 1994 that his probationary period would expire at the end of the 1995-96 academic year and that he needed to begin the year-long application process immediately. The process included the preparation of a dossier by Dr. Garmon containing the information set out in the handbook. Dr. Garmon delivered the dossier to the first reviewing committee on February 14, 1995.

The faculty handbook says that consideration for tenure shall be based on teaching, scholarship other than teaching, service, and institutional need. The review process goes through several stages. The first stage is a review by the Search and Review Committee composed of the division chairperson, two senior faculty members, a junior faculty member, and a student. The Search and Review Committee makes a written recommendation to the Committee on Promotion and Tenure, composed of five tenured full professors elected by the faculty. That committee makes a recommendation to the dean of academic affairs, who in turn forwards the recommendations of the two committees, along with his own

recommendation, to the president of the university. The president recommends tenure to the board of trustees.

Dr. Garmon's application passed through the two committees with a unanimous recommendation for tenure. The dean of academic affairs, however, rejected the recommendation on the basis of institutional need. He stated that he relied on the University Fact Book, which showed there were only three students majoring in religious and philosophical studies, the department in which Dr. Garmon was employed. Since that department already had one tenured professor, the dean decided not to recommend tenure for another.

The fact book showed that the department had never had more than seven majors, and the average for the five years ending in 1994 was 4.6. In 1992, when Dr. Garmon was hired on a tenure track, the number was five. In a letter addressed to the dean on May 1, 1995, just four days before the dean rejected Dr. Garmon's application, the division head reported that the number of majors in the department was ten.

Before acting on Dr. Garmon's request for tenure, the academic dean requested some more information from the head of the division of Humanities and Fine Arts. The head of the division responded one day before the dean had to make his recommendation to the president. The letter reported that Dr. Garmon was teaching less than a full load and that the projected teaching load for the fall semester was the same. Dr. Garmon was not given the chance to refute that evidence and the evidence at the trial showed that he had taught a full load every semester. The university president relied solely on the negative recommendation of the academic dean in making his recommendation to the board of trustees.

After learning that his request for tenure had been turned down, Dr. Garmon requested reconsideration. He also filed a grievance with the University Grievance Committee as provided in the faculty handbook. The dean stopped any reconsideration when Dr. Garmon filed the grievance, and he ignored the recommendation of the grievance committee that Dr. Garmon's application be re-evaluated. Dr. Garmon taught one more year at Fisk and left when the university failed to renew his contract.

## II.

### Breach of Contract

Tenure in most public institutions of higher learning is governed by statute, *see e.g.* Tenn. Code Ann. § 49-8-301, et seq. The tenure rights of teachers at private institutions, however, are governed by contract, *Sawyer v. Mercer*, 594 S.W.2d 696 (Tenn. 1980), and since the contracts vary from one institution to another, tenure rights have to be decided on a case by case basis.

In this case the contract with Dr. Garmon began with an offer on June 19, 1992 when the then dean of academic affairs wrote to him as follows:

> I am delighted at your decision to join the Fisk faculty. This letter is to summarize the terms of your appointment as approved by President Ponder and conveyed in our recent discussions.
>
> You are to be appointed Assistant Professor of Philosophy, effective August 19, 1992. Your assignment will include teaching duties in the Department of Religious and Philosophical Studies, and you are also appointed to the core Faculty. Depending on institution need as determined in my office each term, it is anticipated that your teaching assignment will normally include one or more courses in the University's Core Curriculum.
>
> Your initial salary is to be $28,000 for the academic year (August 19 through May 31), plus normal University benefits. This is a probationary (i.e. tenure track) appointment. Assigned probationary period is four years, ending in 1995-96. Under our policies, a four-year probationary appointment calls for a University decision regarding award of tenure to be rendered prior to the end

of your third year's employment (i.e. by May 31, 1995), presuming that you and we mutually agree to annual contract renewals to carry you to that date.

If the foregoing terms are acceptable to you, you may so indicate by signing in the space provided below, returning one copy of this letter to my office and retaining the other for your own records. I will then ask the Business Office to prepare your formal faculty contract for the President's signature. This appointment letter must, however, be signed and received in my office no later than June 30, 1992; after that date the appointment can no longer be guaranteed, and Fisk must reserve the right to offer this position to another candidate.

Obviously Dr. Garmon accepted the proposal, and he began teaching in the fall of 1992. The parties agree that the faculty handbook contains the factors the university considers for tenure. It also outlines the procedure:

2. An evaluation for promotion and tenure consideration is more searching and thorough than the routine yearly evaluation which all faculty undergo. This is accomplished through the role of two committees - the divisional Search and Review Committee and the Committee on Promotion and Tenure. The Committee on Promotion and Tenure is a five-person committee composed of tenured full professors who are elected to the committee by the Faculty Assembly. The purpose of the Committee on Promotion and Tenure is to make recommendations of promotion and tenure to the dean.

3. The procedure followed during an evaluation for promotion and tenure is as follows:

a. The divisional Search and Review Committee arrives at a divisional decision.

b. The division director writes a letter to the dean of academic affairs and to the Committee on Promotion and Tenure, communicating the divisional decision and summarizing the evidence supporting it; this letter should indicate any divergence of opinion within the Search and Review Committee, and should be signed by each member of that committee.

c. The Committee on Promotion and Tenure will study the recommendations of the Search and Review Committees. Cases in which the Committee on promotion and Tenure feels an inadequate review has been made will be referred back to the Search and Review Committee for further work. If the Promotion and Tenure committee decides to make a recommendation to

the dean which differs from that of the Search and Review Committee, the Promotion and Tenure committee will initiate a meeting with the Search and Review Committee to discuss these differences before final decision on what recommendation to pass on to the dean. This recommendation is to reflect any difference between the Promotion and Tenure Committee and the Search and Review committee.

d. The Committee on promotion and Tenure will make its recommendation to the dean, who in turn makes a recommendation to the president for action.

As we have indicated, Dr. Garmon's request for tenure was rejected solely on the basis of institutional need. With respect to that factor the handbook says:

4. **Institutional need** refers to the requirement that the institution operate an educational program consistent with its statement of purpose and within its financial resources.

How does this vague provision apply to a tenure candidate who has met all the other requirements? In *Chapdelaine v. Torrence*, 532 S.W.2d 542 (Tenn. 1975), a tenured teacher (under a statutory scheme) was discharged, and the university defended on the ground that its budgetary limitations required a reduction in force. The Supreme Court recognized that economic necessity could justify dismissing tenured teachers but that "the burden was on the [university] to show that their actions were fair and conformed to the tone and tenor of the tenure laws." 532 S.W.2d at 549. In this case we think the same rule applies to the denial of tenure on the basis of "institutional need." The university has the burden of showing by competent proof how the institutional need has changed since Dr. Garmon was hired on a tenure track. Otherwise, after three years of pursuing tenure according to the published criteria, the tenure candidate is at the mercy of the academic dean or the president. The "tone and tenor" of the contract in this case does not allow such arbitrary action.

- 6 -

The only proof in this record of the institutional need shows that there have been no significant changes since Dr. Garmon was hired in 1992. The record does not indicate that the university was in a financial crisis -- or even how tenure would affect the university's financial health. The record is inconclusive on the number of majors in Dr. Garmon's department -- the one statistic the academic dean says he relied on. From the evidence, one could conclude that the department had from three to ten majors at the time of the decision to deny tenure. At the time Dr. Garmon was hired the number was apparently five. The witnesses all testified that it was nearly impossible to pin down the number of majors in a department at any particular time. Students tend to change majors often, and the university's records were always slow in catching up.

But we should also recognize that Dr. Garmon was hired to teach the core curriculum also. There is no proof concerning the needs of the school as a whole.

Were this a question of Dr. Garmon's qualifications we would be very careful not to second guess the teaching professionals. "Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals . . . ." *Kunda v. Muhlenberg College*, 621 F.2d 532 at 548 (3rd Cir. 1980).

We conclude that the university failed to show a valid reason for denying tenure to Dr. Garmon.

**III.**

**Race Discrimination**

Dr. Garmon also sued for a violation of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, et seq. and the federal Civil Rights Act, 42 USC § 1981, et seq. He alleged that he was denied tenure because of his race. After hearing the proof, the trial judge found that the evidence preponderated against a finding of racial discrimination and in favor of a finding that the denial was grounded on institutional need. That finding is presumed to be correct. Rule 13(d), Tenn. R. App. Proc.

Dr. Garmon cites the various tests to determine whether a prima facie case of discrimination has been made out and the burden shifting rules applied in discrimination cases. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), and our cases of *Mangrum v. Wal-Mart Stores, Inc.,* 950 S.W.2d 33 (Tenn. App. 1997) and *Brenner v. Textron Aerostructures*, 874 S.W.2d 579 (Tenn. App. 1993). But we are beyond the summary judgment stage; we are at the point of deciding whether Dr. Garmon carried his burden of showing that the reason he was denied tenure was in fact racial discrimination.

Dr. Garmon points to several factors that tend to support his claim: that eighty-seven percent of the tenure awards in the period of 1989-1995 went to African-Americans; that the only person granted tenure in 1995 was an African-American male who had been denied tenure earlier and had less than unanimous support in the reviewing committees; that two white applicants with better credentials (himself included) were denied tenure in 1995; that the previous academic dean testified that he and the president of the university routinely discussed race as a factor in making promotion and tenure decisions.

The president and the current academic dean both denied making race-based decisions in hiring and tenure, and we should point out that one of the applicants denied tenure in 1995 was an African American woman.

With the testimony in conflict, the trial judge's finding necessarily involved a determination of the academic dean's credibility. That determination is exclusively for the trial court, unless other real evidence compels a contrary conclusion. *State ex rel Balsinger v. Town of Madisonville*, 435 S.W.2d 803 (Tenn. 1968).

We do not find that the evidence in the record preponderates against the trial judge's conclusion that the decision to deny tenure to Dr. Garmon was based on considerations other than race.

Although we have found that institutional need was not proven to be a valid reason to deny Dr. Garmon tenure, it does not follow as a matter of course that race was the real reason. Even if "the proferred reason was false does not necessarily mean that the true motive was the illegal one argued by the plaintiff." *Fisher v. Vassar College*, 114 F.3d 1332 (2nd Cir. 1997). Each case must be examined on its facts to determine where the preponderance lies. We are satisfied that the trial judge made the proper finding.

## V.

### The Remedy

A tenured teacher dismissed without compliance with the tenure laws may be entitled to reinstatement, back pay, and "other damages." *Sanders v. Vinson*, 558 S.W.2d 838 (Tenn. 1977). The denial of tenure for reasons violating Title VII of the Civil Rights Act of 1964 as amended, may result in an award of back pay and reinstatement along with other equitable relief. *Kunda v. Muhlenberg College*, 621

F.2d 532 at 549 (3rd Cir. 1980). Title VII vests the courts with broad powers in order to "make persons whole for injuries suffered on account of unlawful employment discrimination." *Id.* Under our decisions the remedies for a breach of an employment contract may include reinstatement and damages for lost wages. *Hooks v. Gibson*, 842 S.W.2d 625 (Tenn. App. 1992).

We think the only judgment that would make Dr. Garmon whole for the university's breach of contract is an order of reinstatement with back pay, and a fair consideration of his application for tenure. We realize that four years have now elapsed and conditions at the university may have changed dramatically, but he is entitled to a good faith decision on his tenure application.

The judgment of the court below is reversed in part, affirmed in part, and remanded to the Chancery Court of Davidson County for the entry of a judgment for back pay and for other proceedings in accordance with this opinion. Tax the costs on appeal to the appellee university.

_____
BEN H. CANTRELL,
PRESIDING JUDGE, M.S.

CONCUR:


_____
WILLIAM C. KOCH, JR., JUDGE


_____
PATRICIA J. COTTRELL, JUDGE